RECORD NO. 13-4013

# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

WAYNE LAMPKIN,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

(The Honorable J. Frederick Motz, U.S.D.J.)

## OPENING BRIEF OF APPELLANT
## WAYNE LAMPKIN

Marc Gregory Hall
LAW OFFICES OF MARC G. HALL
200-A Monroe Street, Suite 310
Rockville, Maryland 20850
(301) 309-6678 Telephone
mghlaw@mac.com

*Counsel for Appellant*                    November 12, 2013

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES ................................................................. 2

STATEMENT OF THE CASE ............................................................. 2

STATEMENT OF THE FACTS ........................................................... 3

SUMMARY OF THE ARGUMENT .................................................... 7

ARGUMENT ...................................................................................... 8


I.    WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO
      EVIDENCE A PRIOR DRUG CASE INVOLVING THE DEFENDANT
      LAMPKIN UNDER FEDERAL RULE OF EVIDENCE 404(b) .................. 8

      A. Standard of Review .................................................................. 8

      B. Argument ................................................................................. 8

           (a) Other crimes, wrongs, or acts ........................................... 8

II.   WHETHER THERE WERE ERRORS IN THE TRANSCRIPTION OF
      THE WIRETAPPED PHONE CALLS SUFFICIENT TO WARRANT A
      NEW TRIAL ................................................................................. 18

      A. Standard of Review ................................................................. 18

      B.  Argument ............................................................................... 18

III.  DID THE TRIAL COURT ERR IN PERMITTING GOVERNMENT
      LAW ENFORCEMENT WITNESSES TO TESTIFY AS EXPERTS,
      AND TO INTERMIX THEIR FACTUAL AND OPINION
      TESTIMONY ................................................................................. 25

i

A. Standard of Review ...................................................................25

B. Argument .................................................................................25

IV.  WHETHER THE DISTRICT COURT ERRED IN NOT GRANTING THE APPELLANT'S RULE 29 MOTION FOR JUDGEMENT OF ACQUITTAL .............................................................................38

A. Standard of Review ...................................................................38

B.  Argument .................................................................................38

V.  WHETHER THE COURT ERRED IN NOT GIVING THE REQUESTED BUYER/SELLER INSTRUCTION TO THE JURY ...........51

VI.  WHETHER THE DISTRICT COURT ERRED IN ITS JURY INSTRUCTION AS TO THE ELEMENT OF KNOWLEDGE...................57

A.  Standard of Review ...................................................................57

B. Argument .................................................................................57

VII.  WHETHER THE DISTRICT COURT ERRED IN FINDING THE QUANTITY OF MORE THAN 100 GRAMS OF HEROIN REASONABLY FORSEEABLE TO THE APPELLANT...........................59

A. Standard Of Review ..................................................................59

B.  Argument .................................................................................60

CONCLUSION ..................................................................................71

REQUEST FOR ORAL ARGUMENT ................................................73

CERTIFICATE OF COMPLIANCE..................................................74

CERTIFICATE OF SERVICE ...........................................................75

# TABLE OF AUTHORITIES

## CASES

Page

*Burks v. United States*,
    437 U.S. 1 (1978) ........................................ 38

*Daily v. United States*,
    282 F.2d 818 (9th Cir. 1960) ........................ 39

*Daubert v. Merrell Dow Pharm. Inc.*,
    509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ........... 36

*Direct Sales Co. v. United States*,
    319 U.S. 703, 63 S. Ct. 1265, 87 L. Ed. 1674 (1943) ............... 40

*Glasser v. United States*,
    315 U.S. 60, 80 L.Ed 680, 62 S. Ct. 457 (1942) .................. 38, 58

*Ianelli v. United States*,
    420 U.S. 770, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975) ............. 39

*Ingram v. United States*,
    360 U.S. 672, 79 S. Ct. 1314, 3 L. Ed. 2d 1503 (1959) ............. 40

*Kotteakos v. United States*,
    328 U.S. 750, S. Ct. 1239, 90 L. Ed. 1557 ............ 17, 56

*Kuhmo Tire Co. V. Carmichael*,
    526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ............ 36, 37

*Michelson v. United States*,
    335 U.S. 469, 69 S. Ct. 213, 93 L. Ed. 168 (1948) ................. 16

*In re Paoli RR Yard PCB Litigation*,
    35 F.3d 717 (3rd Cir. 1994) ......................... 37

iii

*Prince v. Ryan*,
  U.S. Dist. LEXIS 154919 (4-11-12) ............................................. 46

*Schneider v. Fried*, 320 F.3d 396 (3d Cir. 2003) ............................... 36, 37

*Sullivan v. Louisiana*,
  508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) ........................ 58

*United States v. Aisenberg*,
  247 F. Supp. 2d 1273 (Md. Fla) (11th Cir. 2003) .............................. 24

*United States v. Archer*,
  671 F.3d 149 (7th Cir. 2011) ................................................ 40, 69

*United States v. Bailey*,
  990 F.2d 119 (4th Cir. 1993) ................................................ 11

*United States v. Baptiste*,
  596 F.3d 214 (4th Cir. 2010) ................................................ 27

*United States v. Barrandey*,
  481 Fed. Appx. 221 (5th Cir. 2012) .......................................... 46

*United States v. Barnett,*
  63 Fed. Appx. 643 (4th Cir. 2003) ........................................... 27

*United States v Basham*,
  561 F.3d 302 (4th Cir. 2009) ................................................. 9

*United States v. Baxter*,
  416 U.S. 940, 94 S. Ct. 1945, 40 L. Ed. 2d 292 (1974) ....................... 39

*United States v. Bell*,
  5 F.3d 64 (4th Cir. 1993) ................................................... 57

*United States v. Bell*,
  954 F.2d 232 (4th Cir. 1992) ................................................ 52, 73

iv

*United States v. Berry*,
    583 F. Supp. 2d 749 (4th Cir. 2008) ............................................................ 70

*United States. v. Bolden*,
    325 F.3d 471 (4th Cir. 2003) ...................................................................... 61

*United States v. Booker*,
    543 U.S. 220 (2005) ............................................................................... 59, 60

*United States v. Bostian*,
    59 F.3d 474 (4th Cir. 1995) ................................................................. 18, 25

*United States v. Brooks*,
    111 F.3d 365 (4th Cir. 1997) ...................................................................... 17

*United States v. Burgos*,
    94 F.3d 849 (4th Cir. 1996) ................................................................. 38, 57

*United States. v. Bush*,
    28 F.3d 1084 (11th Cir. 1994) .................................................................... 61

*United States v. Cabrera - Beltran*,
    660 F.3d 742 (4th Cir. 1992) ................................................................. 10, 11

*United States v. Canteras - Cano*,
    U.S. Dist. LEXIS 35154 (10th Cir. 2006) ................................................. 46

*United States v. Capers*,
    61 F.3d 1100 (4th Cir. 1995) ...................................................................... 18

*United States v. Caseer*,
    399 F.3d 828 (6th Cir. 2005) ...................................................................... 53

*United States v. Colon*,
    549 F.3d 565 (7th Cir. 2008) ............................................................ 52, 53, 54

*United States v. D'Amato*,
    39 F.3d 1249 (2nd Cir. 1994) ..................................................................... 41

v

*United States v Davis*,
  657 F.2d 637 (4th Cir. 1981) ....................................................... 10

*United States v Douglas*,
  818 F.2d 637 (4th Cir. 1981) ....................................................... 55

*United States v. Edmonds*,
  679 F.2d 1315 (11th Cir. 1987) ................................................... 38

*United States v. Elashyi*,
  554 F.3d 480 (5th Cir. 2008) ...................................................... 53

*United  States v. Espinosa*,
  585 F.3d 418 (8th Cir. 2009) ................................................. 40, 41

*United States. v. Eubuoman*,
  992 F.2d 70 (5th Cir. 1992) ........................................................ 61

*United States v. Farrior*,
  535 F.3d 210 (4th Cir. 2008) ...................................................... 60

*United States v. Foster*,
  634 F.3d 243 (4th Cir. 2011) ...................................................... 57

*United States v. Friske*,
  640 F.3d 1288 (11th Cir. 2011) ................................................... 40

*United States v. Gaudin*,
  515 U.S. 506, 115 S. Ct. 2310, 132 L. Ed. 2d 244 (1995) ........................... 58

*United States v. Gilliam*,
  927 F.2d 1009 (1993) .............................................................. 60

*United States v. Gilliam*,
  987 F.2d 1009 (4th Cir. 1993) ................................................. 46, 62

*United States v. Grow*,
  394 F.2d 182 (4th Cir. 1968) ...................................................... 40

vi

*United States v. Habegger,*
370 F.3d 441 (4th Cir. 2004) ....................................................................... 41

*United States v. Hackley,*
662 F.3d 671 (4th Cir. 2011) ..................................................... 38, 50, 52, 57

*United States v. Harvey,*
845 F.2d 760 (8th Cir. 1988) ....................................................................... 10

*United States v. Hawkins,*
547 F.3d 66 (2d Cir. 2008) .......................................................................... 53

*United States v. Hermanek,*
289 F.3d 1076 (9th Cir. 2006) ..................................................................... 36

*United States v. Hernandez,*
975 F.2d 1035 (4th Cir. 1992) ........................................................ 10, 11, 15

*United States. v. Hernandez-Santiago,*
92 F.3d 97 (2d Cir 1996) ............................................................................. 63

*United States v. Hickman,*
626 F.3d 243 (4th Cir. 2010) ................................................. 38, 41, 46, 57, 69

*United States v Hodge,*
354 F.3d 312 (4th Cir. 2009) ....................................................................... 11

*United States v. Ianiello,*
866 F.2d 540 (2nd Cir. 1989) ...................................................................... 24

*United States v. Ibisevic,*
675 F.3d 342 (4th Cir. 2012) ....................................................................... 17

*United States v. Ince,*
21 F.3d 576 (4th Cir. 1994) ......................................................................... 17

*United States v. Irvin,*
2 F.3d 72 (4th Cir. 1993) ........................................................................ 61, 65

*United States v Irvin*,
 656 F.3d 1151 (10th Cir. 2011) ................................................. 40

*United States v Johnson*,
 592 F.3d 749 (7th Cir. 2010) ..................................................... 52

*United States v. Johnson*,
 617 F.3d 286 (4th Cir. 2010) ......................................... 11, 15, 17, 27, 28, 57

*United States v Johnson*,
 634 F.2d 735 (4th Cir. 1980) ..................................................... 10

*United States v. Kearney*,
 434 U.S. 971, 98 S. Ct. 522, 54 L. Ed. 460 (1977) ...................................... 39

*United States v. Kellum*,
 498 F. Supp. 2d 875 (4th Cir. 2007) ............................................... 57

*United States v. Kincannon*,
 567 F.3d 893 (7th Cir. 2009) ..................................................... 52

*United States v. King*,
 628 F.3d 693 (4th Cir. 2011) ..................................................... 41

*United States v. Lancaster*,
 78 F.3d 888 (4th Cir. 1996) .................................................... 18, 25

*United States v. Lovern*,
 590 F.3d 1095 (10th Cir. 2009) ................................................. 40, 53

*United States v. Mack,*
 495 Fed. Appx. 359 (4th Cir. 2012) .............................................. 46, 57

*United States v. Madden*,
 38 F.3d 747 (4th Cir. 1994) ..................................................... 17

*United States v. Mark*,
 943 F.2d 444 (4th Cir. 1991) ..................................................... 8

*United States v. Marreo-Ortiz*,
    160 F.3d 768 (1st Cir. 1998) ........................................................ 69

*United States v.Marshall*,
    332 F.3d 254 (4th Cir. 2003) ........................................................ 46

*United States v. McBride*,
    676 F.3d 385 (4th Cir. 2012) ................................... 12, 15, 16, 17

*United States v. McGeorge*,
    173 F.3d 426 (4th Cir. 1996) ........................................................ 46

*United States v. McKay*,
    U.S. Dist. LEXIS 12710 (4th 2011) ............................................. 46

*United States v. Mendoza*,
    667 F.3d 882 (8th Cir. 2011) ........................................................ 46

*United States v. Mills*,
    995 F.3d 480 (4th Cir. 1993) ................................................. 54, 55

*United States v. Newsome*,
    322 F.3d 328 (4th Cir. 2005) ........................................................ 57

*United States v. Ollivierre*,
    378 F.3d 412 (4th Cir. 2004) ........................................................ 46

*United States v Queen*,
    132 F.3d 991 (4th Cir. 1997) ................................................... 9, 16

*United States v. Rawle*,
    845 F.2d 1244 (4th Cir. 1988) ................................................. 9, 10

*United States v. Rivera - Hidalgo*,
    458 Fed. Appx. 449 (6th Cir. 2012) ............................................. 46

*United States v. Rivera-Maldonado*,
    194 F.3d 224 (1st Cir. 1999) ........................................................ 69

*United States v. Rogers,*
    209 F.3d 139 (2nd Cir. 1999) ................................................................ 46

*United States v. Rogers,*
    481 Fed. Appx. 157 (11th Cir. 2012) .......................................... 46

*United States v. Rose,*
    U.S. Dist. LEXIS 131957 (1st 2012) ........................................... 46

*United States v. Russell,*
    971 F.2d 1098 (4th Cir. 1992) ...................................................... 57

*United States v. Samet,*
    794 F. Supp. 178 (4th Cir 1992) .................................................. 46

*United States v. Saunders,*
    964 F.2d, 299 (4th Cir. 1992) ...................................................... 12

*United States v. Shabani,*
    513 U.S. 10, 115 S. Ct. 382, 130 L. Ed. 2d 225 (1994) ............... 39

*United States v. Studley,*
    47 F.3d 569 (2nd Cir. 1995) ........................................... 61, 66, 67

*United States v. Tafollo-Cardenas,*
    897 F.2d 976 (9th Cir. 1990) ......................................................... 8

*United States v. Ward,*
    129 F.3d 1209 (11th Cir. 1997) .................................................... 63

*United States v. Williams,*
    985 F.2d 634 (1st Cir. 1993) ........................................................ 10

*United States v. Wilson,*
    484 F.3d 267 (4th Cir. 2007) ................................... 26, 27, 28, 57

*United States v. Yarrington,*
    640 F.3d 772 (7th Cir. 2011) ....................................................... 46

x

*United States v. Yearwood*,
   518 F.3d 220,662 F.3d 679 (4th Cir. 2008) .................................................. 38

*United States v. Young*,
   609 F.3d 348 (4th Cir. 2010) ........................................................................ 52

## STATUTES

18 U.S.C. § 3231 ............................................................................................... 1
21 U.S.C. 841 ................................................................................................... 61
21 § U.S.C. 846 ................................................................................................ 57
21 U.S.C.S. § 860 ............................................................................................. 70
28 U.S.C. § 1291 ............................................................................................... 1

## SENTENCING GUIDELINES

U.S.S.G. §1B1.3 ............................................................ 62, 65, 66, 67, 70
U.S.S.G. § 1B1.3 (a)(1)(B) ........................................................... 61, 62
U.S.S.G. §1B1.3 application note 2 ................................................ 64
U.S.S.G. §1B1.3. cmt. N. 2 (c) (4)) .............................................. 66
U.S.S.G. 2D1.1(a)(3) ........................................................................ 64

## RULES

Fed. R. Evid. 403 ........................................................................... 9, 16
Fed. R. Evid. 404(b) ................................................ 7, 8, 9, 17, 71, 72
Fed. R. Evid. 702 ................................................... 25, 36, 37, 72

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

### No(s). 13-4013
_____

### UNITED STATES OF AMERICA,

### Appellee,

### v.

### WAYNE LAMPKIN,

### Appellant
_____

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (NORTHERN DIVISION)

## (THE HONORABLE J. FREDERICK MOTZ
## UNITED STATES DISTRICT JUDGE)
_____

## BRIEF OF APPELLANT
_____

## JURISDICTIONAL STATEMENT

The district court had jurisdiction in this case under 18 U.S.C. § 3231 and entered final judgment as to Wayne Lampkin on December 18, 2012. Joint Appendix. JA18. Lampkin filed this notice of appeal on December 21, 2012 within 14 days after entry of judgment in his case. JA18. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

**I.    WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE THE FACTS OF PRIOR DRUG CASE INVOLVING THE DEFENDANT LAMPKIN UNDER FEDERAL RULE OF EVIDENCE 404(b)?**

**II.    WHETHER THERE WERE ERRORS IN THE TRANSCRIPTION OF THE WIRETAPPED PHONE CALLS SUFFICIENT TO WARRANT A NEW TRIAL?**

**III.  DID THE TRIAL COURT ERR IN PERMITTING GOVERNMENT LAW ENFORCEMENT WITNESSES TO TESTIFY AS EXPERTS, AND TO INTERMIX THEIR FACTUAL AND OPINION TESTIMONY.**

**IV.    WHETHER THE DISTRICT COURT ERRED IN NOT GRANTING THE APPELLANT'S RULE 29 MOTION FOR JUDGEMENT OF ACQUITTAL.**

**V.  WHETHER THE COURT ERRED IN NOT GIVING THE REQUESTED BUYER/SELLER INSTRUCTION TO THE JURY?**

**VI.  WHETHER THE DISTRICT COURT ERRED IN ITS JURY INSTRUCTION AS TO THE ELEMENT OF KNOWLEDGE?**

**VII.  WHETHER THE DISTRICT COURT ERRED IN FINDING THE QUANTITY OF MORE THAN 100 GRAMS OF HEROIN REASONABLY FORSEEABLE TO THE APPELLANT?**

## STATEMENT OF THE CASE

On April 25, 2012, after a jury trial, Wayne Lampkin was convicted of the following offense, Count One, Conspiracy to Distribute Heroin. On December 18, 2012, a sentence of 120 months was imposed as to Count One. A timely appeal was filed with this Court. Following a successful corum nobis petition challenging the Appellant's state court conviction this Court remanded for the limited purpose

of having the district court resentence in light of the change in the defendant's record. On September 6, 2013 the district court resentenced the appellant to a 60-month term of incarceration. Mr. Lampkin appeals his conviction and sentence in this matter.

## STATEMENT OF THE FACTS

The appellant were charged in a Federal indictment with Conspiracy to Distribute Heroin along with 31 other co-defendants. JA21. The lead defendant was an individual named Christen Gettis through who it was alleged a number of the co-defendants purchased heroin for resale. JA21. Of the 32 total defendants originally indicted in this case Felton and Lampkin went to trial and were convicted. JA18. One defendant was acquitted at trial and the remaining defendants plead guilty. At trial the government established that Mr. Gettis was a large-scale heroin distributor who dealt in kilo quantities. As to the appellant, Wayne Lampkin, Jr., the government established that the following phone calls and text messages occurred during the pendency of this conspiracy.

The government introduced four recorded conversations that all occurred on September 20, 2010. Specifically these were: call 17100 at 3:38pm, call 17105 at 4:24pm, call 17109 at 4:48pm and call 17110 also at 4:48pm. JA527. Each of these phone calls would appear to indicate that Lampkin and Gettis were about to meet. This was further born out by the fact that investigators had installed a pole camera

located outside the Gettis home. The camera showed Gettis and the appellant meeting in front of the Gettis house on that date. JA527.

The next contact between Lampkin and Gettis occurred on September 21, 2010 in a series of phone calls, six in all, which occurred between 3:05pm and 7:32pm. In call number 17174 Gettis says to Lampkin, "a little something came through the pipeline." JA529.    In 17180 Gettis and Lampkin appear to have discussed meeting at the bottom of a hill near the Gettis house. JA530. In call number 17183, there is a further reference to meeting up.  JA530. In call 17187 there is reference to a text between the parties, although no text was ever introduced.  JA531. In call 17188 there is an agreement as to where to meet. JA531. In call 17192 there is a somewhat longer discussion that the parties never successfully met and that Gettis had kept Lampkin waiting. JA531. There is also a discussion of numbers, which Lampkin testified later were a reference to lottery numbers. JA531. Finally in call 17209 there is a statement that Lampkin had "a little something." JA532.

The next contact between Lampkin and Gettis occurred on September 22, 2010, activation number 17266. JA531-533. In that call Gettis and Lampkin are discussing a text, however there was no text presented regarding this date.

Calls 17586 and 17590 occur on September 25, 2010. JA533-534.  Call 17586 is at 4:12pm and relates an earlier case from 1999 or 2000 involving

Lampkin. JA533. Call 17590 was recorded at 4:16pm. JA533-534. Activation #17586 and Activation #17590 occurred eleven seconds apart after #17586 unexpectedly cut off in mid sentence. It would appear those calls referenced an earlier case from 1999-2000 which is mentioned in the calls and does not appear to relate to current events. The F.B.I. summarizations of these two calls bare this out. JA533-534.

There is a text message between Lampkin and Gettis on September 29, 2010 in which the number 10 is sent from Lampkin to Gettis. JA538, 1191. This is the first example of a text being introduced into evidence. However, there were no calls introduced into evidence on September 29, 2010.

There are three phone calls on September 30, 2010, calls 17776 at 11:15am, call 18140 at 4:52pm and call 18152 at 5:20pm. JA534-535. In call number 17776 there is a discussion between Lampkin and Gettis in which Lampkin refers to another individual referred to as a "kid". JA535. Special Agent Ryan interprets this conversation to be about a "runner" for Mr. Lampkin. JA535. In call 18140 there is discussion of Lampkin and Gettis meeting. JA535-536. Finally, call number 18152 is a brief call in which Lampkin tells Gettis that he is there. JA536.

On October 4, 2012 there is one phone call, number 18492, in which Lampkin tells Gettis he is going to "holler at him." JA537. Shortly after this conversation, Lampkin sent a text to Gettis with the number the number "8-10".

5

JA538. Special Agent Ryan opined to the jury that this meant 8-10 grams of heroin. JA538.

The last series of calls between Gettis and Lampkin occurred on October 9, 2010 between 10:40am and 9:17pm. JA539-540. Special Agent Ryan interpreted this series of calls to mean that Mr. Lampkin has someone coming in from Connecticut and Lampkin wanted to supply this person with heroin. JA539. There is also a text from Lampkin to Gettis of the number "50" before call number 18974. JA540.

The government also introduced evidence taken from a search warrant executed at the Appellant's home at 4406 Kenilworth Avenue in Baltimore, Maryland. Recovered during the search warrant was a bottle of inositol. JA709-710. There was testimony from the several agents as well as chemists that inositol can be used as a cutting agent for heroin, but is more commonly used for cocaine.

The government called Special Agent Ryan to testify as an expert witness. Agent Ryan testified that all of the above conversation concerned gram quantities of heroin being sold by Gettis to Lampkin for resale.

The defendant testified at trial that he was not part of a conspiracy to sell heroin with Mr. Gettis. He testified that he had a long-term friendship with Gettis and that they were getting together on the above listed occasions to smoke marijuana or to engage in casual conversation. JA988, 993. The defendant testified

6

that he was a body builder and that the inositol in his home was used by him as a nutritional supplement and that he only used it for that purpose. JA1006-1007. Also introduced in the defense case were photographs of the weight equipment in the defendant's home and photos of the inositol located with a large number of other nutritional supplements. JA1004-1007. Also called by the defendant were his mother, Aquanetta Lampkin, his girlfriend, Aisha Ali, and his father, Wayne Lampkin, Sr., all of who attested to the appellant's interest in bodybuilding and use of inositol as part of his protein shakes.  JA1036-1037,1041 and 1056. Allyson Wynn, Gregorio Lee and Scott Thompson were called and all testified to the good character and the appellant's reputation for truthfulness. JA1064, 1067 and 1971.

## SUMMARY OF THE ARGUMENT

The district court erred in allowing evidence of a prior drug conviction to be admitted under Rule 404(b). The Court also erred in allowing the Government's expert to testify beyond the scope allowed for a police officer defining drug terms. The appellant also contends that the court erred by admitting transcripts of wiretapped conversations that were filled with errors. The court also erred by denying the Rule 29 motion and allowing the case to be submitted to the jury.

During instructions the trial court erred by not giving the requested "buyer/seller" instruction and by not correctly defining the elements as to the conspiracy count.

Finally at sentencing the court incorrectly attributed over 100 grams of heroin to the appellant.

## ARGUMENT

### I. WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE A PRIOR DRUG CASE INVOLVING THE DEFENDANT LAMPKIN UNDER FEDERAL RULE OF EVIDENCE 404(b)?

#### A. Standard of Review:

This Court reviews the district court's rulings on the admissibility of evidence for abuse of discretion. *United States v. Mark*, 943 F.2d. 444, 447 (4th Cir. 1991); *United States v. Tafollo-Cardenas*, 897 F.2d. 976, 980 (9th Cir. 1990)

#### B. Argument:

Federal Rule of Evidence 404(b) allows the prosecution to introduce as evidence, proof of a defendant's prior crimes, wrongs or bad acts to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident". Federal Rule of Evidence 404 (b) provides in relevant part:

**(a) Other crimes, wrongs, or acts**

Evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a

8

criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

In order for the government to introduce 404(b) evidence the government must be able to prove the evidence is 1) relevant to an issue other than character, 2) necessary and 3) reliable. *United States v Basham,* 561 F.3d 302, 325-30 (4th Cir. 2009).

This Court has previously set out a four-prong test to determine the admissibility of evidence under Fed. R. Ev. 404(b) *United States v. Rawle,* 845 F.2d 1244, 1247 (4th Cir. 1988). Evidence of prior bad acts would be admissible if the evidence is (1) relevant to an issue other than the general character of the defendant, (2) necessary, (3) reliable, and (4) if the probative value of the evidence is not substantially outweighed by its prejudicial effect.

More recently this Court again discussed the standard for admissibility of Rule 404 (b) evidence in conjunction with the balancing test required by F.R. Ev. 403. *United States v Queen*, 132 F.3d 991, 995 (4th Cir. 1997). *Queen* states:

> We hold that evidence of prior acts becomes admissible under Fed. R. Evid. 404(b) and 403 if it meets the following criteria: (1) the evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes; (2) the act must be necessary in the sense that it is probative of an essential claim or an element of the offense; (3) the evidence must be reliable; and (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice.

9

The district court is required to exercise great care in the application of Rule 404(b) to the proffered evidence. "Rather than making a broad reference which merely restates the components of the rule, the district court should specify which components of the rule form the basis of its ruling and why. To that end the court should require the party invoking the rule to explain clearly its 404(b) analysis." *United States v. Harvey*, 845 F.2d 760, 762 (8th Cir. 1988).

Courts have been careful to avoid instances where the evidence only tends to show a character trait or propensity for crime. In *United States v. Williams*, 985 F.2d 634 (1st Cir. 1993), the defendant's conviction was reversed where evidence of a prior murder was admitted and no attempt was made to link the acts to any pattern of conduct.

This Court has likewise reached a similar result where the evidence simply demonstrates a criminal propensity or of a defendant's bad character. *United States v Davis,* 657 F.2d 637, 639 (4th Cir. 1981); *United States v Johnson,* 634 F.2d 735, 737-38, 639 (4th Cir. 1980), *United States v. Hernandez*, 975 F.2d 1035 (4th Cir. 1992). In other cases involving narcotics, in which this Court has upheld admission of prior bad acts evidence, the Court has identified a linkage between the prior act evidence and the drug crimes charged in the indictment. Compare *Rawle,* 845 F.2d at 1245-46 (same methods, tractor trailers used to transport marijuana from southern states to northern states) and *United States v. Cabrera –*

10

*Beltran*, 660 F.3d 742, (4th Cir. 1992), (same drugs were sold in similar quantities and transported in same manner once even using the same vehicle) with *Johnson,* 617 F.3d at 298 (testimony held inadmissible that the defendant sold drugs five years before beginning of the conspiracy alleged in the indictment to persons unrelated to the conspiracy) and *Hernandez*, 975 F.2d at 1037-38, 41 (testimony held inadmissible against Hernandez for recipe she allegedly used to cook cocaine six months prior in New York).

Faced with the prospect of either a police officer taking the stand to recite the details of the prior conviction or stipulating to the existence of that fact the appellant Lampkin chose the lesser of two evils and stipulated to the facts of the prior conviction. However, admission of the prior conviction is not the end of the inquiry. This Court needs to examine whether the admission of the prior conviction violated either the Rule 404(b) or 403. The problem with the admission of the prior conviction is that it violates two of the criteria set forth in *Queen*; that is, 1) relevance to an issue and 2) necessity. These two factors, which embody overlapping concerns, are often considered in tandem. *See United States v. Johnson* 617 F.3d at 297 (4th Cir. 2010); *United States v Hodge*, 354 F. 3d at 312 4th Cir. 2009); *United States v. Bailey,* 990 F.2d 119, 124 (4th Cir. 1993).

The prior bad act evidence against appellant fails on both necessity and relevance grounds.  The prior bad act evidence did not arise out of the same series

of transactions as the events of this case. Nothing that occurred in January 2004 was necessary to complete the story of this offense, which occurred in 2010. Moreover, the prior bad act of 2004 was not similar to the offense charged in 2010. Appellant was not alleged in 2004 to be a participant in a conspiracy, there were no wiretaps, no co-conspirators, and no heroin was involved. Nor was the prior bad act similar in time, pattern or state of mind.

The government will argue appellant's plea of not guilty required the prosecution to prove beyond a reasonable doubt each and every element of the crime including appellant's intent. While this statement of law is accurate, it does not provide a general license for the use of essentially unrelated prior bad act evidence. *See United States v. McBride*, 676 F.3d 385 (4th Cir. 2012). The type of linkage supporting admission of such evidence is notably absent in case at bar. Instead, the prior conviction was used primarily to establish appellant's character as a "drug dealer." This is the very type of evidence that the limitation imposed by Rule 404 (b) was designed to exclude. *See United States v. Saunders,* 964 F.2d, 299 (4th Cir. 1992)

The government also used the prior bad act evidence to try to paint appellant as untruthful in its cross examination of the defendant.

*By* Mr. Romano:

Question:  When the search warrant was executed at your residence at 9812 Lyons Mills Rd. the police asked you if there were any drugs or any money or any weapons and you told them no, didn't you?
Appellant:  "Yes."
Question:  But they found drugs, didn't they?
Appellant:  "Yes, they did."
Question:  They found money, didn't they?
Appellant:  "Yes.  The way the question was put to me at the time was like large amounts of money.  They didn't just say money."
Question:  Several hundred dollars, wasn't it?
Appellant:  "I think $390 would be correct."
Question:  But you told them you didn't have any money right?
Appellant:  "Yes, I did."
Question:  They also asked you if there were any weapons and you told them no, correct?
Appellant:  "Yes, I did."
Question:  They found a loaded gun, didn't they?
Appellant:  "They found a unloaded gun in a bin in the garage, not in the home."
Question:  Oh, so if they had asked you if you had a loaded gun in the house you would have told them the truth, you would have told them yes?
Appellant:  "The gun wasn't loaded."
Question:  The stipulation indicates that there was a loaded firearm, the stipulation you signed?
Appellant:  "It was a firearm with a magazine with shells in the magazine.  The gun was unloaded. JA1022-1023.

There was nothing in the prior bad act evidence involving the gun, which could be construed to enhance or complete the government's narrative of this conspiracy at trial. JA946-948.  Furthermore, the stipulation appellant signed was entered at trial and there was no mention of a loaded handgun in the stipulation. JA946-948.

During the questioning of Ms. Ali the government again brought up

appellant's prior conviction.

*By* Mr. Romano:

Question: Are you familiar with an address at 9812 Lyons Mills Road, Owings Mills?
Ms. Ali: Um hum. I used to live there too.
Question: And then you and Mr. Lampkin and the two children were living at that address when Baltimore County police executed a search warrant there.
Ms. Ali: Yes
Question: You were present?
Ms. Ali: Yes
Question: Mr. Lampkin was present?
Ms. Ali: Yes
Question: The two children were present?
Ms. Ali: Yes.
Question: And when the police executed the search warrant they found a number of things including drugs and a gun did they not?
Ms. Ali: Yes
Question: They found a scale with drug residue. Do you remember that?
Ms. Ali: I don't know
Question: Okay. You remember drugs and the gun though, correct?
Ms. Ali: Yes, I do.
Question: And all that, didn't belong to you? That all belonged to Wayne, correct?
Ms. Ali: Well, I don't know. No. Not that I know of. His cuz, I mean his brother, used to live with us off and on. And that's what we assumed, that this belonged to him.
Question: You assumed it belonged to him?
Ms. Ali: Yeah.
Question: Did you even know it was there?
Ms. Ali: No
Question: You didn't even know it was there?
Ms. Ali: No, not at all.
Question: But it wasn't his brother who pled guilty and was convicted?
Ms. Ali: No
Question: It was Wayne?
Ms. Ali: Yes.

14

Question: And that's when he went to jail?
Ms. Ali: Yep. JA1050-1052.

This line of questioning further proves the government only used the appellant's prior conviction to portray him as a drug dealer in front of the jury. There was no relevance or necessity for this line of questioning towards Ms. Ali, as prior to her testimony, it had already been established and stipulated that appellant had a prior conviction. Again, it did not complete the story of this case. Moreover, Lampkin's prior conviction was an Alford Plea in which he has always maintained his innocence and which has been now been vacated by the Baltimore County Circuit Court.

In *Hernandez* the district court instructed the jury that it should consider this testimony only as evidence of the defendant's intent. The appellate court nevertheless held that the evidence was improperly admitted. The evidence served merely to depict the defendant as an experienced drug dealer. (*See Hernandez* 975 F.2d at 1041). Similarly in *Johnson*, the district court gave a limiting instruction restricting the jury's consideration of the evidence. *See Johnson*, 617 F.3d at 297. This Court held the district court improperly admitted this evidence because it related to conduct that occurred almost five years before the events for which the defendant was on trial and was not related directly or indirectly to the charged conduct or conspiracy. *See id* at 298. Like *Johnson, Hernandez* and *McBride* the

15

evidence before the district court here was unrelated to the crimes charged and thus was not necessary to prove the element of appellant's intent.

Appellant also meets the fourth factor of the *Johnson* and *Queen* test as admission of this prior bad act evidence resulted in unfair prejudice and potential for confusion. The present case is not a situation in which "bad act" evidence admitted against the defendant "was only prejudicial because it was highly probative." (*See Queen* 132 F.3d at 998) Rather, the evidence was inherently prejudicial in the absence of any plausible probative value and the effect of the evidence, if not its purpose, was merely to brand appellant as a drug dealer before the jury. (*See McBride*, 676 F.3d 385 (4th Cir. 2012).

If a limiting instruction always insured that the jury would consider the evidence only for the purposes for which it was admitted there would be no need to make the balance mandated by Rule 403. The probative value here was outweighed by the prejudicial effects of admitting prior bad acts evidence and cannot be cured by limiting instructions. A jury instruction does not rescue the use of otherwise inadmissible evidence. This is especially true in appellant's case in which the prior "bad act" evidence lacked plausible probative value. (*See Michelson v. United States,* 335 U.S. 469, 475-76, 69 S. Ct. 213, 93 L. Ed. 168 (1948) and *see McBride*, 676 F.3d 385 (4th Cir. 2012). The Fourth Circuit held

in *United States vs. Johnson,* 617 F.3d at 298 "the meager protection afforded by the court's limiting instruction, however can not outweigh the prejudice incurred by evidence that does not meet the mandate of the rule in the first instance, and the fact that a defendant may have been involved in drug activity in the past does not in and of itself provide sufficient nexus to the charged conduct where the prior activity is not related in time, manner, place or pattern of conduct."

The error in allowing the 404(b) evidence was not harmless as the error did affect the jury's verdict. (See *United States v. Madden*, 38 F.3d 747, 753 (4th Cir. 1994) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765-66 S. Ct. 1239, 90 L. Ed. 1557) See also *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997).

The Fourth Circuit has held "the question is not simply whether we believe irrespective of the error there was sufficient untainted evidence to convict, but more stringently whether we believe it highly probable that the error did not affect the judgment. (*See United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994); *United States v. Ibisevic*, 675 F.3d 342 (4th Cir. 2012) at 16-17 (4th Cir. 2012) ; *see also McBride*, 676 F.3d 385 (4th Cir. 2012).

**II.    WHETHER THERE WERE ERRORS IN THE TRANSCRIPTION OF THE WIRETAPPED PHONE CALLS SUFFICIENT TO WARRANT A NEW TRIAL?**

**A. Standard of Review:** The decision regarding the admission of evidence is vested in the discretion of the trial court, and is reviewed by this Court for the abuse of this discretion. Un*ited States v. Lancaster,* 78 F.3d 888, 896 (4th Cir. 1996); U*nited States v. Bostian*, 59 F.3d 474, 480 (4th Cir. 1995).

**B.   Argument**

In *United States v. Capers*, 61 F.3d 1100, 1107 (4th Cir. 1995) this Court held it's within the trial court's discretion to allow the jury to use an accurate transcript to assist them in listening to a recording.

Special Agent Ryan testified, "I prepared the transcripts and compared the transcripts Government's Exhibit 1-B to the calls in Government's Exhibit 1-A and to the best of my knowledge they are accurate. JA274. Special Agent Ryan later corrected mistakes in the transcripts on his own while testifying, At one point Ryan stated, "happy should say heavy." JA433. Later he corrected the transcript again, "holes should say wholes" JA496. And a third time he testified,  "tips should say chips" JA521.

Special Agent Ryan was asked on cross-examination, Question: "There were two phone calls that appear to have happened on the same date and time, if that could be a mistake in the time signature?  Is that a misprint or were they one

18

immediately after the other?" Special Agent Ryan: "I'm sure that's a typographic error, it would be impossible for two conversations to happen at the same time." JA837.

By Mr. Bittenr:

Question:  The transcripts don't go to the jury because sometimes the transcript isn't correct?
SA Ryan:  "I would imagine so." JA593.

During the sentencing hearing appellant presented numerous errors and changes made by the F.B.I. to the transcripts given to the jury that differed from the F.B.I. summarization.  Appellant asked the court to admit the transcripts and other documents into evidence for appellate review. JA1315, 1317 and 1333. Appellant then began pointing out the errors made by the F.B.I. in the transcripts used by the jury.

September 20, 2010 the second Lampkin line says "coming down the Alameda, getting ready to stop in there."  JA1317. Appellant directed the court's attention to the government's summarization of the call.  It says "Wayne, coming down the Alameda, getting ready to stop by there.  Appellant pointed out this call was summarized Special Agent L. Crawley and Special Agent Tom Ryan. JA1318. The by that was said on the tapes was changed to in.  The pole camera footage Government's Exhibit 82 A-F shows appellant only stopped by (not entering the residence) and did not go in as the government wrote.

19

On September 20, 2010 Activitation #17109, the government writes "yo, I'm right here, I'm getting ready to pull up, I'm talking to uh, ni in a awright nice em up nice." JA1318. Special Agent Ryan testified that meant get a quantity of heroin together. JA1318. Appellant testified, "he was telling his children, who were in the car with him he was talking to Nyia's mother Naesea". JA992. Ms. Ali also testified concerning the names Nyia and Naesea. Wayne Lampkin Sr. also testified concerning the names and relationship to Nyia and Naesea. JA1059. Moreover, appellant introduced into evidence his daughter Nyia's birth certificate and pointed out how the government broke her name into syllables and took her mother's name and confused it with a heroin order without any reliable principles or methods to interpret the call. JA1318.

The Appellant also pointed out to the court the pole camera footage. Government's 82 A-F shows "I only stopped by there, never leaving out of the camera's view, I was still on my phone the whole time me and Mr. Gettis was in front of his house even though the call between appellant and Gettis had ended; and not even a handshake or anything that can be viewed as an exchange." JA1319.

Appellant directed the court's attention to Activation 17192 where Special Agent Ryan placed dashes between the number 4 and 19 and 98 and 12, trying to make those numbers appear as heroin orders to support his earlier testimony that

"frequently it wasn't referred to at all, just by number.  JA1320. You say 10 it's understood what you mean 10 grams of heroin." JA296, 1320.   Appellant testified that he plays 419 and 9812 when he plays the lottery. JA997. His birthday is April 19 and his former address was 9812 Lyons Mills Road. JA997. Mr. Romano later put appellant's driver license into evidence. JA24-1025.

Appellant pointed out Activation 17776, which the government determined that the beginning of the call was non-pertinent and testified the call happened on September 30, 2010 at 11:15 AM.  JA1322. Appellant then directed the court's attention to Activation 17265 from September 22 2010 to show the court the exact same statement appears on both activations given to the jury eight days apart. JA1322. Appellant asked the court to look at page 10 the second page of transcript of Activation 17776 and compare the first Lampkin line here to a line from the summarization of Activation 17776 on page 11 of the appellant's sentencing exhibit.  JA1342. Appellant pointed out that this call was summarized by Special Agent M. Perry on September 27, 2010 three days before the government's witness testified the call took place. JA1320-1321.

Appellant offered as further proof to the court that the dates and transcripts were riddled with inaccuracies by directing the court's attention to the summarization of a call between Mr. Gettis and Milton Blake in which another call comes into the session and is assigned Activation #17820.  JA1321.  The call

21

between Gettis and Blake was reviewed on September 28, 2010 and the appellant asked the trial court how can Activation #17820 happen before Activation #17776 as the government's witness testified. JA1322.  Also, Special Agent Ryan previously testified, "each call that is captured on the Title III wiretap equipment is given what we call an Activation number." JA277.  His prior testimony is further proof Activation #17776 could not have been captured after Activation #17820.

Moreover, looking at the first two calls the government alleges took place on September 30, 2010, Activitation # 17776 at 11:15a.m. and Activitation # 18140 at 4:52 p.m. the government alleged 364 calls took place on one phone during that time period. That would mean 364 calls took place in 637 minutes, at a rate of 1.76 calls per minute. However, looking at other Activation numbers specifically # 18152 September 30, 2010 and Activation # 18492 October 4, 2010, it took four days for 340 calls to be recorded. Or looking at Activation # 17174 September 21, 2010 and Activation # 17590 September 25, 2010, which took four days for 416 calls. In other words it strains credulity to believe 364 calls took place in five hours and 37 minutes.

In Activation #17586, the appellant pointed out this call referenced 1999-2000 time period and cut off mid-sentence. The conversation resumed 11 seconds later, which is Activation #17590, and continued talking about the incident from 1999-2000.  JA1322-1323. However, the government interpreted only the phrase

"and I'm like no, I'm going to pay him, you know that's my man, yo, if he ain't told why we ain't in" to make it seem like this conversation was happening in the present. JA1322-1323.    Appellant then referenced the fourth and fifth Lampkin line in Activation #17590, "that he was thinking about giving Mikey, UI (unintelligible) and I said for what." JA1323. And then Gettis asked, "About doing what?" JA1324. Lampkin says: "Giving Mikey some dream." JA1324.  Appellant cites page 17, which is the summarization of that call by Special Agent L. Crawley, which was reviewed by Special Agent Aaron McGee, Special Agent Ryan's partner. JA1350.  The summarization states: "George says something about giving Mikey some green." JA1350.  Both weed and green are slang for marijuana. Furthermore, appellant informed the court what he said in the fourth Lampkin line was not unintelligible as he said: "Giving Mikey some weed" and the fifth Lampkin line: "Giving Mikey some green." JA1324.

Moreover, the summarization of Activation #17590 shows the government was aware that this conversation referred to March 2000 and not the time period covered by this case. JA1324.

Appellant next cited Special Agent Ryan's testimony concerning Activation #18492, while reading directly from the transcript book, which the agent testifies, "a few lines down in fact he says I'm going to text you." JA538, 1325. There is no mention of a text in the transcripts of Activation #18492. JA538.

23

The transcripts were horribly inaccurate and therefore prejudicial as they did not meet the standards set forth by the court in *Capers*. In *United States v. Ianiello*, 866 F.2d 540 (2nd Cir. 1989) the conviction was vacated because the government knowingly gave the jury transcripts that contained many errors harmful to the defendant.

Similarly, in the case of *United States v. Aisenberg*, 247 F. Supp. 2d 1273 (Md. Fla) (11th Cir. 2003) the court found the agents who overheard the conversations, prepared transcripts in which the agents had distorted what was actually said on tapes to what they wrote in the transcripts. The Court found that the defense had a right to argue and the jury the right to believe the whole taping process was unreliable.

Appellant pointed out that the transcripts were used to offer every interpretation, which was prejudicial to the appellant. JA1321. Furthermore, the Court advised the defense to use the transcripts rather than playing the tapes during the defense case. The court:

Let me just say for the record, you don't have to play, obviously the transcripts are not evidence. But it's easier for you to examine from the transcript and that's fine. You all heard the tape is what's the evidence JA989.

Moreover, the government played numerous calls in succession then directed the jury's attention to a particular page in the transcript book where Special Agent Ryan offered his interpretation. JA527, 531. The court stated, "I am

concerned about…it does appear that there's, that conversations from activation could have been exactly the same. And that causes me some concern." JA1329.

The transcripts were inaccurate, prejudicial and heavily relied on by the government to argue its case to the jury. Although the Court gave the jury instructions regarding the transcripts not being evidence, the transcripts were extensively used at while the agent offered his interpretation and therefore left the most lasting impression on the jury.

## III. DID THE TRIAL COURT ERR IN PERMITTING GOVERNMENT LAW ENFORCEMENT WITNESSES TO TESTIFY AS EXPERTS, AND TO INTERMIX THEIR FACTUAL AND OPINION TESTIMONY.

### A. Standard of Review:

The decision regarding the admission of evidence is vested in the discretion of the trial court, and is reviewed by this Court for the abuse of this discretion. U*nited States v. Lancaster,* 78 F.3d 888, 896 (4th Cir. 1996); U*nited States v. Bostian*, 59 F.3d 474, 480 (4th Cir. 1995).

### B. Argument:

Federal Rules of Evidence Rule 702 governs the testimony of Expert Witnesses and reads:

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods and;

(d) the expert has reliably applied the principles and methods to the facts of the case.

It is well settled in the courts that narcotics agents may be qualified as experts on coded-language and drug jargon.

The Fourth Circuit outlined in *United States v. Wilson*, 484 F.3d 267 (2007) the appropriate manner in which narcotics officers should be qualified as experts. This Court in *Wilson* noted with approval the Detective's testimony: "It all depends on the context of the calls… I take the person who's talking, the conversation. I take what has this person, what's the routine pattern of this person before and the pattern after. That's how I make my determination. When you hear a word time and time again then there's a pattern that develops that ultimately shows you what they're talking about".

This Court in *Wilson* found "although the district court erred in failing to exclude Seabolt's testimony when that testimony either interpreted language that needed no interpretation or when Seabolt failed to adequately explain his methodology in reaching a questionable interpretation; the net effect was harmless because the overwhelming majority of Seabolt's expert testimony was properly admitted, that properly admitted testimony was alone sufficient to show appellant's guilt… and any prejudice that flowed from the limited amount of improper

testimony was outweighed by Seabolt's properly admitted testimony and the corroborative testimony of co-conspirators."

In *United States v. Baptiste*, 596 F.3d 214, 222-23 (4th Cir. 2010) the Fourth Circuit noted "the detective decoded the conversations by examining them in the context of other calls placed between the suspects which were corroborated at trial by actual participants of those conversations." In *United States v. Barnett* 63 Fed. .Appx. 643 (4th Cir. 2003), the Fourth Circuit held "the Special Agent testimony was corroborated by Adam's explanation of the conversations in which he took part." In *United States v. Johnson* 617 F.3d 294 (4th cir. 2010) and *Wilson* 484 F.3d at 276-77 the Fourth Circuit held "expert witnesses must adequately explain why he interpreted certain phrases and words in wiretapped conversations." The Court continued, "a defendant must apprise the district court of any inadequately explained interpretations in order to preserve his objection."

Appellant cites to an objection lodged against Special Agent Ryan's ability to define words. JA255. After repeatedly objecting to Special Agent Ryan's interpretations the defense was given a continuing objection. JA337. And when defense tried to object to a specific instance in Special Agent Ryan's testimony the Court stated "overruled you have a continuous objection." JA339.

27

Having met the mandates of the Fourth Circuit in *Johnson*, 617 F.3d at 294

and *Wilson*, 484 F.3d at 276-277 the appellant however takes issue with Special

Agent Ryan's testimony and qualifications.

Special Agent Ryan offered the following testimony:

"11 years F.B.I., 6 years Safe Streets D.C., before that another task force in D.C. all experience is in D.C., bulk of knowledge comes from personal experience." JA244-245.

"Familiar with coded language by listening to calls as they happen or after the fact, debriefing sources and subjects during course of career. Words may be new to you as you're listening, you have to look at the context of the call, you have to use common sense. JA248.

Later Agent Ryan testifies, "bulk of his experience is in D.C." JA250.

"I listened to all the calls, listening to all the calls assists in interpreting calls." JA258.

Again contradicts earlier testimony by testifying, "I listened to the majority of calls" JA258.

"I've got the most knowledge of this case and I've got the context of all the call and our investigation."

"Different areas of D.C. each use their own drug lingo and different groups do; I have no experience in Baltimore prior to this investigation."
Question: No idea what coded language may be in different areas of Baltimore?
SA Ryan: "May or may not depending if they were commonly used in D.C. or other cases I've worked."
Question: Never been involved in any drug investigations involving people from the east side? No reference to drug lingo in Baltimore before this case?
SA Ryan: "We had other agents on this case who have been involved in Baltimore investigation." JA251-253.

SA Ryan: "Normally you look at the context of the conversation. If it doesn't feel right, then I feel it's wrong. Not only in the context of the investigation but the context of the conversation."

Question: You have particular targets. So you have a predisposed context to the conversation?

SA Ryan: "We have an understanding of the context yes. JA252.

Special Agent Ryan testified, "I spoke to other members of the conspiracy which confirmed his understanding of the context of the calls he listened to." JA270. However, not one co-defendant or co-operating witness testified to the meaning of code words or corroborated Special Agent Ryan's interpretations. Nor did any agents with experience in the Baltimore area offer testimony supporting Special Agent Ryan's interpretations.

The government alleged calls involving different couriers and Ms. Capel also involved code words. And the fact that there was heroin recovered from the couriers and Ms. Capel bolster Special Agents Ryan's interpretations of these code words. JA335. However, there were no calls played concerning code words between Ms. Bess, the courier who heroin was seized, and Mr. Gettis. Furthermore, Ms. Bess was the only courier from whom heroin was seized. JA466. Ms. Capel was not captured on the wiretap using code words, the officers in Ms. Capel's case received information on both occasions from a confidential informant not the wiretaps. JA347, 349.

Special Agent Ryan testified the following:

Sweat suits, Nike be dropping exclusives, those words were heroin orders because "it didn't make sense in the context of not only the conversation, but of the case. It's not common language somebody would use if they were actually interested in sweat suits. JA286.

Question: It is your opinion that certain phrases certain numbers refer to heroin and heroin quantities?
SA Ryan: "Based on my experience in this case that's my belief." JA292.

The Court earlier warned Special Agent Ryan "your belief isn't relevant, if it's your belief I'm going to strike that." JA283.284. However, the Special Agent continued to base his opinions on his belief.

Question: Reference sweat suits, considered to be code in reference to what?
SA Ryan: "Heroin in general not a specific quantity." (See id at 107)
Question: Specifically, asking those things that mean heroin in this case?
SA Ryan: "Frequently it wasn't referred to at all. Just by number."
Question: So just say a number?
SA Ryan: "Right, you say 10, it's understood what you mean is 10 grams of heroin."
Question: Couldn't it possibly mean anything else?
SA Ryan: "Of course it could. I'm saying in the context of the case." (See id at 110) No reliable methods for this agent's interpretation.
Question: Do we have the all-exclusive list of terms for heroin in this case?
SA Ryan: "Probably not."
Question: I'm asking for it, the list of heroin term?
SA Ryan: "I know, I've given you the one's I could recall."
Question: Do you need something to refresh you memory?
SA Ryan: "No. I don't know that I would have written them down."
Question: See if you can think of any other terms?
SA Ryan: "I can't off the top of my head."
Question: So any word can be a substitute for heroin in these calls?
SA Ryan: "Several words. I don't know any word. It would depend on the context."

30

Question:  What you are saying is you do not have an all-encompassing list of words that are used?
SA Ryan:  "There is no such list."
Question:  So anything anyone wants to use could be heroin?
SA Ryan:  "Yes."
Question:  Those words could have their own English language meaning, non-drug related?
SA Ryan:  "Of course." JA296-298.

The Special Agent's testimony above illustrates the need for the Supreme Court and Fourth Circuit mandates to be followed, which requires an expert opinion to be reliable and requires the expert to explain how he reached his/her conclusion.  The agent in this case was not from the area, never worked in the area before, did not write the alleged heroin terms down, could not compare conversations between the participants, nor could the agent point to a pattern in appellants calls.

The agent's testimony continued as follows:

Questions:  The context for you comes from the fact that you think Mr. Gettis is a heroin dealer?
SA Ryan:  "I know he's a heroin dealer JA297.

Special Agent Ryan testified, "the term hollar is commonly used when narcotics transactions are going to take place.  I need to hollar at him or her usually means that I'm going to make a drug purchase."  An objection was filed which was overruled and the Court stated, "that's what he says." JA294.  However, the agent could not point to one instance where hollar was used and then a heroin deal was transacted.  Furthermore, when defense counsel asked: "If I was to hollar at

31

somebody, that's not automatically about drugs?"   SA Ryan testified, "No."
JA295. Special Agent Ryan based his interpretation on the person speaking not the
context of the call.

With Special Agent Ryan's prior testimony in mind appellant asks the Court
to look specifically at the agent's interpretations of the calls used in this case
against the appellant. The government played four calls in succession and then
directed Special Agent Ryan to interpret the third call Activation 17109 from the
transcript book.  Special Agent Ryan offered the following interpretations:

"Nice em up nice" from Activation 17109, 9-20-10 as get the heroin ready.
JA527.  Special Agent Ryan did not explain how he reached his conclusion, nor
could the agent point to a pattern between appellant and Gettis as September 20,
2010 was the first day the government entered calls against appellant.

Viewing the meaning in the context of the call the alleged phrase "nice em
up nice" is preceded by "I'm talking to."  Appellant testified at trial "I was talking
to daughters mother Naesea," pronounced Nice-sa. JA985.  Moreover, appellant
submitted to the court daughter's birth certificate at sentencing with Naesea's name
on it. JA1318.  The alleged phrase 'Nice em up nice" was never used during this
investigation.  Because her name did not make sense to the agent he automatically
made it a heroin order.

Special Agent Ryan interpreted "a little something came through the pipeline" as code for some heroin recently came in. JA528. Again Special Agent Ryan did not offer any methods on how he interpreted Activation #17109. Moreover, Special Agent Ryan did produce any facts that heroin actually was received nor did he articulate any facts to support his opinion that appellant had purchased heroin the day before. JA527.

Special Agent Ryan interpreted the transcript of Activation 17192 on September 21, 2010 by placing misleading dashes between the numbers JA1320.

Special Agent Ryan testified about the "hill" in Activation 17180 stating, "we observed Gettis serving customers here in the past." JA530. Again he offered no evidence to support that testimony. The government's photographs of that area were not taken during the investigation. JA497.

The government played five more calls in succession then Special Agent Ryan interpreted the middle call, Activation 17209 "I got a little bit" as unnecessarily vague that can indicate code. In this case talking about money, "He's got a little bit of money from the sale of heroin." JA573-574. Again, no methodology on how he reached his conclusion, nor any facts.

Special Agent Ryan interpreted "that's some shit pimps do" from Activation # 17266 September 22, 2010 as "Mr. Gettis responding to a text Lampkin had sent to him; Mr. Lampkin texted him an offer at a lower price point then Mr. Gettis was

willing to sell him." JA533. However, this agent again had no facts to support his opinion as there was no text message entered on September 22, 2010. The first text massage entered into evidence was from September 29, 2010. JA538.

Special Agent Ryan interpreted Activation 17590. "I'll bring like, I got like" as vague reference for money. JA534. Not only did the agent not explain how he reached that interpretation the evidence produced by the government proves appellant did not see Gettis on September 25, 2010, but did not even talk to him again until September 30, 2010.

Special Agent Ryan interpreted just the phrase "if he ain't told why we ain't in" as a dispute between Wayne, George and Mikey whether someone was a snitch and Mr. Lampkin is posing the question "if he told why ain't we in?" JA534. Activation 17590 was a continuation from call 17586 both on September 25, 2010 which cutoff mid sentence. JA533-534. Activation 17586 began at 16:12:34 and lasted 4:03 minutes and dropped at 16:16:37. Activation 17590 began at 16:16:48, eleven seconds after 17586 dropped. JA533-534. The summarization which appellant put into evidence proves the government knew this conversation was in reference to 1999-2000, yet SA Ryan offered an interpretation out of context. JA533-534, 1347 and 1350.

Special Agent Ryan interpreted Activation 17776 as "Mr. Lampkin referring to a runner one of the young people he's got reselling heroin for him abandoning

an area that he was doing well in, to try a new area he's taking a chance." JA534-535.  There are no facts to support this opinion as "appellant was not observed doing anything during this investigation."  Special Agent Ryan's testimony at trial was that the appellant's phone wasn't tapped. JA835.

Moreover, this excerpt from Activation 17776 was also on Activation 17265 eight days apart.  Appellant pointed this out to the district court at sentencing JA1320-1321.  The Court stated, "It does appear that there's that conversations from activation could have been you said exactly the same thing.  Activation 17265 and 17776 is exactly the same.  And that causes me some concern.  I am aware of that." JA1329. Also, appellant pointed out this activation 17776 actually took place on September 27, 2010 and not September 30, 2010 as SA Ryan testified to. JA1321, 1343 and 1344.

Special Agent Ryan offered differing opinions concerning the phrase "hollar at you". JA283-284, 295, 109, 829 and 846.  The government's evidence showed appellant never met Gettis on October 10, 2010.  Also, there was no mention of a text in Activation 18492, which Special Agent Ryan testified, "the text would be code for 'order'." JA538. Appellant explained what hollar at you meant at sentencing and that he used the term in Activation 17590 but it wasn't heroin related. JA1324-1325.

Special Agent Ryan's interpretation of Activation 18912 October 9, 2010 also was unfounded and made no sense. Logic would dictate that a drug dealer is not going to come from Connecticut to Baltimore to purchase a small amount of heroin and then not get the drugs. JA539-540 and 854.

The Fourth Circuit requires the District Court to make sure the proffered expert explains how he reached his conclusions. However, this was not done in appellant's case. Similar to the agent in *United States v. Hermanek*, 289 F.3d 1076 (9th Cir. 2006) Special Agent Ryan based his opinions not on the context of the calls but rather his knowledge of Mr. Gettis. Special Agent Ryan had no reliable methods to interpret appellant's calls nor did he explain how he reached his conclusions.

The Supreme Court held in *Kuhmo Tire Co. V. Carmichael* 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) that qualifications alone while impressive do not satisfy the mandates of 702. Furthermore, the Supreme Court has explained that Rule 702 imposes a "special obligation" upon district court judges to act as "gatekeepers" to ensure that expert testimony meets the Rule 702 requirements of qualifications, reliability and fit. (See *Kuhmo; Daubert v. Merrell Dow Pharm. Inc*. 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); and *Schneider v. Fried* 320 F.3d 396, 404 (3d 2003) ("explaining the trilogy of restrictions on expert testimony embodied in Rule 702"). In performing this

gatekeeping function, a court must analyze each of the three restrictions on expert testimony that is the Court must consider the proposed experts qualifications, the reliability of his methods and whether his testimony fits the case at hand. (*See Schneider* 320 F.3d at 404).

Whether the expert is appropriately qualified, whether his/her testimony is relevant and whether his/her testimony is reliable are all distinct inquiries under the rules of evidence governing expert testimony. The bar for establishing that a witness has the requisite specialization is not set especially high as a broad range of knowledge, skills and training qualify an expert. (*See In re Paoli RR Yard PCB Litig.*, 35 F.3d 717, 741 (3d 1994)

Reliability, the second requirement, calls for the Court to determine whether an expert witness' testimony is based upon a reliable methodology rather than subjective belief or unsupported speculation. (*See Kumho Tire* 526 U.S. at 150-52) In determining reliability of expert testimony the focus is on the expert's principles and methodology not on the conclusions reached.

Fed. Rule Evid. 702 advisory committee's note to the 2000 amendments states that the trial judge must find that the proffered expert testimony is properly grounded, well reasoned and not speculative before it can be admitted. The... expert must explain how the conclusion is so ground. The Supreme Court stated, "As we said in Daubert we've been presented with only the expert's qualifications,

his conclusions and his assurances of reliability. Under *Daubert* that's not enough. The case against appellant is exactly what courts have warned against; a proffered expert with no methodology as to how he reached his conclusions.

## IV. WHETHER THE DISTRICT COURT ERRED IN NOT GRANTING THE APPELLANT'S RULE 29 MOTION FOR JUDGEMENT OF ACQUITTAL.

### A. Standard of Review

In a sufficiency challenge, this court must review the evidence as to whether "there is substantial evidence, taking the view most favorable to the Government, to support" the verdict. *Glasser v. United States*, 315 U.S. 60, 80 (1942). Reversal for insufficient evidence is reserved for cases in which "the prosecution's failure is clear." *Burks v. United States*, 437 U.S. 1, 17 (1978).

### B. Argument

In order to prove conspiracy the government was required to establish three elements beyond a reasonable doubt that (1) an agreement to distribute and possess heroin with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy. *United States v. Hackley*, 662 F.3d 671 (4th Cir. 2011); *United States v. Yearwood*, 518 F.3d 220, 225 – {662 F.3d 679} 26 (4th Cir. 2008); *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc). *See also*: *United States v. Hickman*, 626 F.3d 756 (4th Cir. 2010); *United States v.*

*Edmonds* 679 F.3d 169 (4th Cir. 2012). The essence of conspiracy is the agreement. *United States v. Shabani*, 513 U.S. 10,16, 115 S.Ct. 382, 130 L.Ed 2d 225 (1994) quoting *Ianelli v. United States, 4*20 U.S. 770, 777, 95 S.Ct 1284, 43 L.Ed 2d. 616 (1975). The presence of a knowing and voluntary agreement distinguishes conspiracy from the completed crime and is therefore an essential element of the crime of conspiracy.

To prove appellant's participation in the overall conspiracy the government was required to prove the agreement to effectuate the conspiracy's central criminal purpose, the distribution of heroin in the Baltimore area and that the appellant had actual knowledge of the conspiracy's existence. See *Daily v. United States*, 282 F.2d 818, 820 (9th Cir. 1960).

The government must prove appellant knew the purpose of the conspiracy and that he knew or he had reason to know that others were involved and that it benefited from his dealings with co-defendant Gettis. *United States v. Kearney*, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed 460 (1977); *United States v. Baxter*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed. 2d 292 (1974).

The evidence against appellant consisted of 22 wiretap phone calls and 4 text messages over 7 no consecutive days, which were interpreted by the case agent. The phone calls showed the appellant and Gettis were friends, however, there is nothing in their conversations to infer a conspiratorial agreement. The

government asked the jury to infer a prior agreement based on appellant's friendship with Gettis that predated the wiretaps by twenty-four (24) years.

Although inferences have their place in the chain of evidence in any trial…charges of conspiracy are not to be made out by piling inference upon inference…thus fashioning…a dragnet to draw in all substantive crimes. *Direct Sales Co. v. United States*, 319 U.S. 703, 711 63 S.Ct. 1265, 87 L.Ed. 1674 (1943); *Ingram v. United States*, 360 U.S. 672, 680 79 S.Ct. 1314, 3 L.Ed 2d 1503 (1959); *United States v. Grow* 394 F.2d 182, 199 (4th Cir. 1968). *See also United States v. Archer*, 671 F.3d 149 (7th Cir. 2011) the government must show more than a mere association with others involved in criminal activity.

While the jury may draw reasonable inferences from direct or circumstantial evidence an inference must be more than speculation and conjecture to be reasonable and caution must be taken that the conviction not be obtained by piling inference on top of inference. *United States v Irvin*, 656 F.3d 1151 (10th Cir. 2011). In *United States v. Lovern,* 590 F.3d 1095 the court stated, "it is a bedrock principle of our criminal justice system that evidence supporting a conviction must raise more than a suspicion of guilt, and the jury's inferences must be more than speculation and conjecture to be reasonable". *United States v. Friske*, 640 F.3d 1288 (11th Cir. 2011). "When the government relies on circumstantial evidence, reasonable inferences not mere speculation must support the conviction", *United*

*States v. Espinosa*, 585 F.3d 418 (8th Cir. 2009). "We can not sustain a conviction based on mere suspicion or the possibility of guilt"; *United States v. D'Amato*, 39 F.3d 1249 (2nd Cir. 1994) "a conviction based on speculation and surmise alone can not stand." This is of course the law in the Fourth Circuit as well; *United States v. King*, 628 F.3d 693 U.S. App. Lexis 474 (4th Cir. 2011); *United States v. Habegger*, 370 F.3d 441, 444-45 (4th Cir. 2004) and *United States v. Hickman,* 626 F.3d 756 (4th Cir. 2010).

All the Circuit Courts have indicated a significant reluctance to apply a conspiracy conviction to an individual whose most heinous apparent crime is choosing the wrong friends. More than mere association with bad people who are committing crimes is required for a conspiracy conviction. The government's evidence against the appellant clearly shows no transactions, a lack of surveillance, no corroborating testimony from alleged co-conspirators and no agreement nor knowledge of the conspiracies existence.

Special Agent Ryan testified, that the investigation began in December 2009 and the Title III wiretap began in February 2010. The agent's testimony continued, "calls are categorized as pertinent and non-pertinent, simply meaning they are relevant to illegal activity that's being investigated. JA271. Later the agent testified he along with the prosecution determined which calls would be played before the jury. JA825.

The government alleges that September 20, 2010 was the first date appellant had a pertinent phone call during this investigation of Mr. Gettis. JA526-527. Furthermore the government alleges the third Activation on September 20, 2010 Act. #17109 appellant was ordering heroin. JA527. However, there was nothing to indicate heroin activity (i.e. code words or references to heroin) in the two Activations prior to Act. #17109, Act. Numbers 17100 and 17105. Moreover, the government's evidence from September 20, 2010 pole camera footage shows no transactions but shows only appellant talking on his cell phone while meeting Mr. Gettis. JA528-529.

Special Agent Perry testified that the pole camera was on 24/7, they have the capability of coming back during normal business hours, double checking…and the capacity to look up and down the street to a degree He further testified the pole camera was in front of Mr. Gettis' home from May 8, 2010 thru February 2011 JA528. Government's exhibit 82 A-F were still photos taken from the video of the pole camera. JA529. Special Agent Perry testified, that during the ten months he was involved in this case September 20, 2010 was the only time appellant was on pole camera and he stated that he doesn't believe he sees any drugs exchanged. He also testifies that the pole camera of September 20, 2010 is the only occasion between September 20, 2010 and October 9, 2010 (the period of appellant's calls) appellant was seen and it did not capture any drugs transaction. "to support his

42

conclusion" Special Agent Ryan using pole camera photo's 72-D-H testified, "he (the heroin customer) appears to have something in his hand." JA456. Special Agent Ryan alleged the photo camera could catch something as small as 4 grams of heroin in someone's hand from the other side of the street, then later testified "50 grams a quantity a little smaller than a baseball could have been passed on September 20, 2010 and not be captured by the pole camera." JA848. Special Agent Ryan testified; "the pole camera photos don't depict any exchange of any object or something that could be viewed as a handshake. JA847.   Special Agent Ryan also testified, "the pole camera footage does not capture the entirety of the meeting ". JA847-848.   However, the pole camera was a video from which the government made still photos in Government's Ex. 82 A-F. Both Special Agents testified to the clarity of the photo camera and that no drugs were exchanged. Furthermore, Special Agent Ryan interpreted a call between Gettis and a heroin "customer" ordering four grams of heroin and again the government uses pole camera footage. JA455. To support his conclusion" Special Agent Ryan used pole camera photo's 72-D-H while testifying, "he (the heroin customer) appears to have something in his hand." JA456. Special Agent Ryan alleged the photo camera could catch something as small as 4 grams of heroin in someone's hand from the other side of the street, then later testified "50 grams a quantity a little smaller than

a baseball could have been passed on September 20, 2010 and not be captured by the pole camera." JA848.

Special Agent Ryan testified, "there was no need to tap appellant's phone and there was no surveillance of him doing anything in this case JA835-836. Question:" There were no conversations between appellant and Felton or Gardner. Special Agent Ryan: "No, we weren't tapping anyone else's phones other than Gettis, Beaufort and Cosby. JA836. Special Agent Ryan testified, "there were no calls between Cosby, Beaufort and appellant. JA836. Special Agent Ryan testified: "bottom of the hill refers to Andover and the Alameda, as a frequent meeting place that they observed Mr. Gettis meeting with heroin customers. JA530. However, the government presented no evidence to support this testimony. Government's Exhibit 38-A-H, photos of Andover and the Alameda were not taken during the investigation, rather they were taken "recently" in preparation for trial according to Special Agent Ryan's testimony. JA497. The government had a lack of surveillance on this appellant because appellant never purchased drugs or had any kind of transaction with Mr. Gettis and heroin.

The government alleged one bottle of Inositol found during the search warrant of the Appellant's home, was a cutting agent for heroin. JA710. Special Agent Jenkins testified concerning the bottle of Inositol found in appellant's home and reads the label of the bottle, which reads "dietary supplement". Her testimony

44

continues "No residue of any heroin" nor were drugs of any kind found at appellant's residence. JA710.  During the defense case numerous supplements were introduced as evidence as well as photos of a home gym. JA1004-1005. Furthermore, the government had four expert chemists as well as numerous Special Agents testify concerning cutting agents that are commonly used for heroin. None of these were found in the Appellant's home but rather found with confiscated heroin in different residences of the alleged conspirators. Moreover, not one of the expert chemists identified inositol as a cutting agent for heroin nor was inositol found in the confiscated heroin in which they tested.

DEA Supervisor Special Agent Ellington offered expert testimony he was familiar with chemical agents used to cut heroin.  JA926. The agent testified that the most common cutting agent seen in Baltimore was quinine and caffeine. The agent testified that Mannitol or mannite are also commonly used.  It could be, Inositol could be used.  I've actually seen where they use carpet cleaner." JA926. He further testifies, "Inositol is a very common cutting agent for cocaine and Inositol is a dietary supplement." JA926. This agent's testimony concerning the most common cutting agents for heroin is corroborated by the testimony of numerous Special Agents as well as DEA Chemists and the government's confiscation of quinine, mannite and caffeine from numerous co-conspirators. None had Inositol.

Furthermore, DEA Special Agent Ellington's testimony of "Inositol" is a very common cutting agent for cocaine is consistent with case law from every circuit. see *United States v. Mack,* 495 Fed. Appx. 359 (4th Cir. 2012); *United States v. Gilliam*, 987 F.2d 1009, 1013 (4th Cir. 1993); *United States v. McKay*, U.S. Dist. LEXIS 12710 (4th 2011); *United States v. Samet*, 794 F. Supp. 178 (4th Cir 1992); *United States v. McGeorge,* 173 F. 3d 426 (4th Cir. 1996); *United States v. Rose*, U.S. Dist. LEXIS 131957 (1st 2012); *United States v. Rogers,* 209 F.3d 139 (2ND Cir. 1999); *United States v. Barrandey*, 481 Fed. Appx. 221 (5th Cir. 2012); *United States v. Rivera – Hidalgo,* 458 Fed. Appx. 449 (6th Cir. 2012); *United States v. Yarrington*, 640 F.3d 772 (7th Cir. 2011); *United States v. Mendoza,* 667 F.3d 882 (8th Cir. 2011); *Prince v. Ryan,* U.S. Dist. LEXIS 154919 (4-11-12); *United States v. Canteras – Cano,* U.S. Dist. LEXIS 35154 (10th Cir. 2006); *United States v. Rogers*, 481 Fed. Appx. 157 (11th 2012) "cocaine and testimony of case agent, Inositol powder used for cutting cocaine". The Fourth Circuit has numerous cases in which mannitol and quinine are testified to as being a cutting agent for heroin. Un*ited States v.Marshall*, 332 F.3d 254 (4th Cir. 2003); *United States v. Ollivierre*, 378 F.3d 412 (4th Cir. 2004); *United States v. Hickman*, 626 F.3d 243 (4th Cir. 2010).

DEA Special Agent Ellington's testimony was the only testimony of the numerous Special Agents and expert chemists to identify Inositol as a possible

cutting agent for heroin, and even he admitted Inositol was more commonly a cutting agent for cocaine. JA934.

Further undercutting the Government's theory that Mr. Gettis and the appellant were co-conspirators was the absence of contact when a large seizure of Mr. Gettis heroin occurred. There was a significant seizure of two and a half kilos of heroin there is no evidence Gettis contacted the appellant Lampkin.

*By* Mr. Hall

Question:  He didn't talk to Mr. Lampkin about that event did he?

Special Agent Ryan:  Not that I can recall. JA836-837.

However following the seizure on June 18, 2010 there is evidence that Gettis contacted other co-conspirators such as, Williams, Beaufort, Montgomery and Peters to discuss the seizure from Ms. Bess. JA836. Though this seizure took place on June 18, 2010 the first pertinent, albeit unrelated, call between Gettis and appellant was on September 20, 2010, Activation #17100. JA527.

The government alleges three text messages between Gettis and Lampkin were heroin orders.   However, the government's evidence shows no meetings or transactions took place on the days text messages were exchanged.   Furthermore Gettis describes his heroin and pricing for heroin with others.  However, none of the descriptions or pricing is in the conversations between appellant and Gettis. Special Agent Ryan testified as follows: "heroin is not the only substance sold in

gram quantities." JA827. "It's possible cocaine and marijuana are sold in gram quantities. Cocaine is typically sold in quantities related to ounces or certain gram weights. Not as familiar with marijuana, but that is sold by the pound, quarter pound, and ounce." JA844. Special Agent Ryan earlier testified to his expertise and training in Narcotics and the numerous classes he has attended and now testifies: he is not as familiar with certain drugs. JA 243-245. Special Agent Ryan testified, drug dealers often change their phones. However, the government's evidence showed appellant had his phone for almost two years. JA825.

Special Agent Ryan interpreted Act #18974 and a text on October 10, 2010 as a customer of Mr. Lampkin's coming from Connecticut to purchase 50 grams of heroin. JA539-540. However, when looking at the entire case and the testimony of the government's witnesses, Special Agent Ryan's testimony here does not make common sense. Special Agent Ryan, the case agent testified:" the heroin Gettis receives comes from New York/New Jersey based supplier. Cooperating witnesses also testified to bringing heroin from New York to Baltimore and money from Baltimore to New York. The government's proffered expert DEA supervisory Special Agent Ellington testified that heroin typically goes to a source city first; New York, Atlanta, Houston, Los Angeles then is broken down and sent to consumer cities such as Baltimore. JA918. "Generally speaking larger quantities of heroin go to source cities first and eventually will make it down to consumer

cities, Baltimore is a consumer city." JA918.    You would find higher quality heroin at the source rather than the streets of Baltimore."JA919.

*By* Mr. Hall

Question:  People around the State of Maryland, if they wanted to buy heroin might go to Baltimore?

Special Agent Ellington: "Yes."

Question:  If you're going to buy something illegal you'd want to spend the least amount of time possible out on the road carrying that substance?

Special Agent Ellington: "Yes."

Question:  Would you agree it would be unlikely you would drive from Connecticut down to Maryland to buy a small quantity of heroin?  Wouldn't that be unusual?

Special Agent Ellington: "Yeah, probably." JA944-945.

It defies logic that a heroin customer would drive from Connecticut, bypass a larger heroin source such as New York, to go to Baltimore to buy heroin and then not obtain the heroin. The government's proffered expert DEA Special Agent Ellington testified: "we learn most of our information from debriefing suspects, informants and cooperating witnesses. JA915-916.  The experts' testimony would indicate people who are involved in the narcotics trade would know where to find the best prices and quality. The government has failed to prove any implicit,

explicit or tacit agreement. In *United States v. Hackley,* 662 F.3d 671 (4th Cir. 2011) this Court in affirming noted the following: Continuing relationships, repeated transactions, the testimony of two confidential informants who had purchased from the defendant and a conversation between Hackley and Dearing. The Court further held: "this case represents the very boundary of what passes for substantial evidence of a conspiracy" and warned the government must take care not to ask the jury to infer an agreement based on guilt of distribution.

The case at bar has less evidence than Hackley, moreover the government asked the jury to infer an agreement based on appellant having a friendship with Mr. Gettis which predated the wiretaps by twenty-four years. Furthermore, Special Agent Ryan's testimony was as follows concerning appellant:

Question: So out of the entire city of Baltimore you did not discover anyone Mr. Lampkin sold heroin to?

SA Ryan: Out of the entire country. JA853-854.

Based upon the improbability of some of the actions attributed to the appellant, the lack of surveillance, significant telephone calls and the government's inability to connect the appellant to a single heroin sale the Court erred in not granting the appellant's Rule 29 Motion for Acquittal at the close of the government's case in chief. It is clear from the government's evidence that

appellant did not have a conspiratorial agreement with Gettis or knowledge of the conspiracies existence.

### V.  WHETHER THE COURT ERRED IN NOT GIVING THE REQUESTED BUYER/SELLER INSTRUCTION TO THE JURY?

The government introduced the concept of a buyer/seller agreement in their opening statement and throughout their case in chief.  During the government's opening statement they told the jury "Mr. Lampkin was a customer of Mr. Gettis who then turned around and sold the heroin to his own customers." The government also placed appellant's photograph in the box titled "Resellers" in Government's Exhibit 89.   Furthermore, the testimony of two government expert witnesses furthers the theory of a buyer/seller agreement between Gettis and the appellant rather than Lampkin being aware or a member of the Gettis conspiracy.

Special Agent Ryan testified "some dealers may make purchases and turn around and just order as they need and buy it from Mr. Gettis and then turn around and sell to Mr. X. JA838

DEA Special Agent Ellington testified, "Generally, in Baltimore City, it's a wide range.  You could have an individual who's just selling by himself or you could have a more organized type of operation." JA921.

The government alleged on the first day appellant had a pertinent conversation with Mr. Gettis.  September 20, 2010, during which this investigation was in its tenth month, that appellant was ordering heroin without showing any

prior agreement.  JA526.  The government did not prove any agreement prior to September 20, 2010 or through the two weeks appellant communicated with Mr. Gettis.  The essence of conspiracy is the agreement.  The gist of the crime of conspiracy is an agreement to effectuate a criminal act.  *United States v. Bell*, 954 F.2d 232 (4th Cir. 1992). Without showing an agreement, even viewing the evidence in the light most favorable to the government, the government's evidence will only support a buyer/seller relationship.

The Fourth Circuit held in *United States v. Hackley*, 662 F.3d 679 (2012) and *United States v. Young*, 609 F.3d 348 (2010), evidence showing a buyer/seller relationship will not support a conspiracy conviction, standing alone.  Looking at cases in the Seventh Circuit supports the Fourth Circuits holdings.

In *United States v. Colon*, 549 F.3d 565 (7th Cir. 2008) the court held "there are practical reasons for not collating sale with conspiracy.  A sale by definition requires two parties: their combination for that limited purpose does not increase the likelihood the sale would take place. (Quoting Supreme Court). In *United States v. Johnson*, 592 F.3d 749 (7th Cir. 2010) the court looked at it's decision in *United States v. Kincannon*, 567 F.3d 893 (7th Cir. 2009) and reiterated a drug purchaser does not enter into a conspiracy with his supplier simply by reselling the drugs to his own customers.  A conspiracy requires more; it requires evidence that the buyer and seller entered into an "agreement to commit a crime other than the

crime that consists of the sale itself." (See *Colon* at 569.)  The Court continued "we have routinely held that a conviction for conspiracy to distribute drugs cannot be sustained solely on circumstantial evidence if the evidence contains no basis for the jury to distinguish the alleged conspiracy from the underlying buyer/seller relationship." (See *Colon*, 549 at 567)  Thus to prove conspiracy the government must offer evidence establishing an agreement to distribute drugs that is distinct from evidence of the agreement to complete the underlying drug deals.  This rule is based on a fundamental principle of criminal law, the requirement that the government prove the defendant guilty beyond a reasonable doubt.

This is the law throughout the other Circuits. *see United States v. Lovern*, 590 F.3d 1095, 1106-07 (10th Cir. 2009) "when evidence… gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction, as under these circumstances a reasonable jury must necessarily entertain a reasonable doubt"; *see also United States v. Elashyi¸*554 F.3d 480, 492 (5th Cir. 2008) "When the evidence is essentially in balance, a reasonable jury must necessarily entertain a reasonable doubt"; *United States v. Hawkins,* 547 F.3d 66, 71 (2d Cir. 2008) (same); *United States v. Caseer,* 399 F.3d 828, 840 (6th Cir. 2005) (same).  Absent some other evidence of a conspiratorial agreement to tip the scales, the jury must acquit.  Otherwise, the law would make

any "wholesale customer of a conspiracy… a co-conspirator per se." (*See Colon,* 549 F.3d at 569).

The government's evidence offered against appellant consisted of twenty-two phone calls and four text messages. The government had witness testimony alleging three of the text messages were heroin orders, however their evidence does not show any transactions or meetings taking place on the days text messages were exchanged. Hence, this is why the Supreme Court warned not collating sale with conspiracy because there is no likelihood a sale would take place. Moreover, the government has failed to show any conspiratorial agreement. A buyer/seller relationship is all the jury could infer from the evidence and without more will not support a conspiracy conviction.

The government argued against the instruction citing *United States v. Mills*, 995 F.3d 480 (4th Cir. 1993). The Fourth Circuit affirmed co-defendant Scales conviction in the *Mills* case holding "it appears to us that Scales did in fact agree with Manko to peddle cocaine when he purchased cocaine from Manko, arranged to have Manko brought to North Carolina with cocaine and stored Manko's cocaine in his house. We further believe Scales joined this conspiracy willfully when he contacted Manko personally to inquire when he would return to North Carolina and then arranged for him to come to Raleigh." The Court continued "the evidence was that Scales not only bought and sold cocaine, but he also assisted

Manko in both housing cocaine and in traveling to North Carolina to sell cocaine." The facts in *Mills* differ greatly than the evidence presented in the case against appellant Lampkin. Also, missing from the government's evidence is any of the circumstantial evidence that separates a conspiracy from a buyer/seller agreement, such as the purchase of large quantities, sales on consignment or credit (fronted), an agreement to look for other customers, or warnings of threats from law enforcement or competitors.

The government stated, "as far as the fact that he purchases from you know and he was referred to by Special Agent as a 'customer', Christian Gettis was a customer of Billy Guy.   But to say that they're involved in just a buy/sell relationship, I think the word 'customer' doesn't necessarily or automatically equate, customer equals buyer/seller and nothing more."   There are two issues with the government's argument.  The first can be found in the government's assertion concerning the word 'customer'.  The Supreme Court has held that a word must be given its defined meaning unless the statute defines it otherwise. Webster's Collegiate Dictionary defines customer as "one who buys". However simply being a customer does not equate with being a co conspirator. The characterization as a customer clearly separates that party from being a conspirator". *United States v. Douglas*, 818 F.2d 1315, 1319 (11th Cir. 1987). The second issue can be found in the government's evidence.  The government played

a call between Mr. Guy and Mr. Gettis in which Mr. Guy says "you got to get that down to zero, you owe 82, 5 and I'm still dumping on you." Special Agent Ryan interpreted that call as Guy telling Mr. Gettis even though you owe me $82,500 dollars I'm still fronting you heroin. Fronting of drugs implies an agreement to pay after the drugs are sold.

The court held in denying the requested instruction, "That is a very difficult area which, frankly I don't think lends itself to pure conceptual analysis. I think an argument can be made that the premise of all these cases, that the buyer/seller exception, when granted is good law itself is subject to question. I am not sure that is really true. Seems to me that the existence of the buyer/seller relationship is evidence of a conspiracy. JA1092-1093.The court's opinion however went against well-established law.

The government's theory is that appellant had a relationship with Gettis that predated the wiretaps, knew he sold heroin and brought heroin from him which standing alone does not make appellant a conspirator. The Supreme Court held – "thieves who dispose of their loot to a single receiver – a single fence – do not by that fact alone become confederates. They may but it takes more than knowledge that he is a fence to make them such. *Kotteakos v. United States*, 328 U.S. 750, 755 (1946). Moreover, courts in every circuit have ruled repeated transactions alone do not constitute a conspiracy.

## VI.    WHETHER THE DISTRICT COURT ERRED IN ITS JURY INSTRUCTION AS TO THE ELEMENT OF KNOWLEDGE?

### A.  Standard of Review:

This Court reviews the district court's instructions for abuse of discretion. *United States v. Russell*, 971 F.2d. 1098, 1107 (4th Cir. 1992).

### B. Argument:

The jury instructions given in this case charged the jury with finding the defendant's guilty of two essential elements. JA1131.   However, this Court's case law and precedent requires three elements to prove a conspiracy beyond a reasonable doubt.

A conspiracy pursuant to 21 § U.S.C 846 requires proof of (1) an agreement between two or more persons to engage in conduct that violates a federal drug law; (2) the defendant's knowledge of the conspiracies existence; and (3) the defendants knowing and voluntary participation in the conspiracy. See: *United States v. Hackley*, 662 F.3d 671 (4th Cir. 2011); *United States v. Mack*, 495 Fed. Appx. 359 (4th Cir. 2012); *United States v. Foster*, 634 F.3d 243 (4th Cir. 2011); *United States v. Hickman*, 626 F.3d 756 (4th Cir. 2010); *United States v. Kellum*, 498 F.Supp. 2d 875 (4th Cir. 2007); *United States v. Newsome,* 322 F.3d 328, 333 (4th Cir. 2005); *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996); *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007); *United States v. Bell*, 5 F.3d 64, 66-67 (4th Cir. 1993); *United states v. Johnson*, 617 F.3d 286 (4th Cir. 2010).

The jury instructions effectively left out the second element (2) knowledge of the conspiracies existence. Therefore, the jury only had to find two elements rather than the three elements required by law. Moreover, the case against appellant was purely circumstantial and therefore the importance of the issue of knowledge was heightened.

In *United States v. Glasser*, 315 U.S. 60, 80 86 L.ED 680, 62 S. Ct. 457 (1942) the court held while circumstantial evidence may sufficiently support a conspiracy conviction the government must prove each element of a conspiracy beyond a reasonable doubt. (see *Glasser* at at 80) To require less would eviscerate the government's burden to prove all elements of a crime beyond a reasonable doubt and relieve the government of its burden of vigilance in prosecuting crimes thereby violating bedrock principles of our Anglo-American jurisprudence.

In *Sullivan v. Louisiana*, 508 U.S. 275, 278 113 S.Ct 2078, 124 L.Ed 2d 182 (1993) the Court held the government is entitled to prove its case solely on circumstantial evidence provided of course that the government still demonstrates 'Each Element' of the charged offense beyond a reasonable doubt. It thus remains axiomatic that "it would not satisfy the Constitution to have a jury determine that a defendant is probably guilty".

In *United States v. Gaudin*, 515 U.S. 506, 510 115 S.Ct 2310, 132 L.Ed 2d 244 (1995) the Supreme Court held that the Fifth and Sixth Amendments to the

U.S. Constitution require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged beyond a reasonable doubt.

Appellant maintained at trial that he did not have any knowledge of Mr. Gettis drug operation and had not seen him in about a year prior to September 20, 2012. JA988. However, the government alleged appellant was trying to buy heroin on September 20, 2010 without showing appellant had any knowledge of the existence of the conspiracy. Also, not one of the conversations between appellant and Gettis could it be inferred appellant had knowledge Mr. Gettis was working with others to violate the law again showing that the appellant lacked knowledge of the size and scope of the Gettis conspiracy. The government of course will argue that the second element uses the word knowingly and thus the element of knowledge is covered. However, by diminishing the element of actual knowledge of the conspiracies existence in the jury instructions and requiring the jury to decide the case on two elements, the possibility of a wrongful conviction was increased.

**VII. WHETHER THE DISTRICT COURT ERRED IN FINDING THE QUANTITY OF MORE THAN 100 GRAMS OF HEROIN REASONABLY FORSEEABLE TO THE APPELLANT?**

A.    **Standard Of Review**: This Court reviews the sentence imposed upon a criminal defendant for "reasonableness." *United States v. Booker*, 543 U.S. 220,

261-62 (2005). In reviewing the reasonableness of a sentence this court applies an abuse-of-discretion standard. *United States v. Farrior,* 535 F.3d 210, 224 (4th Cir. 2008); *Gall v. United States*, 552 U.S. 38, 51 (2007).

**B.    Argument:**

The court must determine at sentencing what quantity of controlled dangerous substance is reasonably foreseeable to the defendant by a preponderance of the evidence standard. This court in the *United States v. Gilliam,* 927 F.2d 1009 (1993) outlined how this standard may be met. The following colloquy took place at sentencing between the Court and counsel.

Ms. Ducao: The government feels, believes, that one hundred grams or more at least one hundred grams or more, is attributable to the defendant.

The Court:  You were close to a hundred but not quite to a hundred.

Mr. Hall: My understanding it was 70.

Ms. Ducao:  I submit your Honor that was the evidence that could be substantiated as to the defendant.  JA1304.

The government failed to meet this standard as there was no evidence, stipulation or witness testimony, factors outlined by this Court produced at sentencing to increase drug quantity beyond the less than quantity the Court had previously ruled attributable to appellant. JA1299-1300. Moreover, the government admitted on the record that "70 grams was the evidence that could be substantiated as to the defendant."    The government argued "what was attributable to the

60

defendant as part of the conspiracy…is more." JA1304.  Counsel for appellant disagreed with the government's position.  The Court responded as follows:

The Court:   But the relevant legal standard is…it was a conspiracy charge…what was reasonably foreseeable to him as part of the conspiracy. However, the relevant legal standard is reasonably foreseeable within the scope of defendant's agreement. JA1306.

In order to hold a defendant accountable for the conduct of his co-conspirators the sentencing court must make particularized findings with respect to both prongs of U.S.S.G. § 1B1.3 (A)(1)(b) regarding both the scope of the defendant's agreement and the foreseeability of his coconspirators conduct. *United States. v. Bolden*, 325 F.3d 471, 499 (4th Cir. 2003)- This Court is in agreement with the finding of other Circuit Courts around the country on this issue. *See United States v. Studley*, 47 F.3d 569. 575 (2d. Cir. 1995); *United States. v. Bush,* 28 F.3d 1084 (11th Cir. 1994) and *United States. v. Eubuoman*, 992 F.2d 70 (5th Cir. 1992);

In. *United States v. Irvin*, 2 F.3d 72, 77-78 (4th Cir. 1993) this Court held that the lower court should have used the "relevant conduct" section of the United States Sentencing Guidelines to determine the quantity of narcotics reasonably foreseeable to each co-conspirator within the scope of the agreement. Furthermore, in order to apply the sentencing structure of 21 U.S.C. 841 properly a district court

must first apply U.S.S.G. 1B1.3 "Relevant Conduct". *See Also United States. v. Gilliam* 987 F.2d at 1012-13 (4th Cir. 1993). Looking at the *Studley* case which was cited by this Court, the Second Circuit Court of Appeals found it was error to find that the defendant participated in "jointly undertaken criminal activity" the first prong of U.S.S.G. § 1B1.3 where defendant's agreement to participate in fraudulent loan scheme was limited to his own fraudulent activity and not the fraudulent activity of others. The court in *Studley* then cited the commentary of U.S.S.G. § 1B1.3 stating the application note sets out a two prong test, and in order to determine the defendants accountability for the conduct of others under subsection (a)(1)(B) the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake. This determination as it goes to prong one of the test must be made before the issue of foreseeability, prong two is reached.

In examining relevant conduct the Court takes note of the language used in the United States Sentencing Guidelines as well as the application note number 2.

A "jointly undertaken criminal activity" is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy.

In the case of Jointly undertaken criminal activity provides that a defendant is accountable for the conduct (acts and omissions) of others that was both:

(A) in furtherance of the jointly undertaken criminal activity; and

62

(B) Reasonably foreseeable in connection with that criminal activity.

Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the jointly undertaken criminal activity") is not the necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement.)

In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.

Note that the criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity are not necessarily identical.

This is again in agreement with the standard set in other circuits. *See United States v. Ward*, 129 F.3d 1209 (11th Cir. 1997)- "relevant conduct of a conspiracy defendant for sentencing purposes did not include the entire conspiracy, as he did not join until several months after its inception."

In *United States. v. Hernandez-Santiago*, 92 F.3d 97 (2d Cir 1996) the district court at the sentencing hearing "expressed the view that in determining relevant conduct under the Guidelines, it would hold a defendant responsible for the sale of the amount of cocaine that was reasonably foreseeable or understood by

him to have been involved" in the conspiracy during the period of his participation." Defense counsel argued against such an application of relevant conduct arguing that the court must first determine what the defendant agreed to do (scope of defendant's agreement), which the court disagreed and stated " I think that a defendant is responsible for whatever distribution took place as long as it's foreseeable to him over the period during which he was a participant in the conspiracy." The 2nd Circuit disagreed with the sentencing court and held, "Determining the base offense level for sentencing Hernandez under the U.S.S.G. sec. 2D1.1(a)(3), requires the court to first calculate his "relevant conduct" under U.S.S.G. 1B1.3 (a)(1)(B), in the case of jointly undertaken criminal activity. Keeping in mind that "the scope of the criminal activity jointly undertaken by the defendant is not necessarily the same as the scope of the entire conspiracy and hence relevant conduct is not necessarily the same for every participant," U.S.S.G 1B1.3, application note 2." "We have interpreted this section to require that " in order to hold a defendant accountable for the acts of others, a district court must make two particularized findings: 1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the def."    Hernandez argued the district court only applied the foreseeability criterion and failed to make the required finding that the quantity of drugs he was being held accountable for were "within the scope of his agreement." The Circuit Court agreed with

Hernandez that the district court used only the foreseeability criterion, without making a particularized finding as to the scope of the defendant's agreement." The district court applied an incorrect legal standard and thus did not make a particularized finding as to quantity of drugs properly attributable to Hernandez and vacated the sentence and remanded for further fact finding and for resentencing. Similar to the court in *Hernandez*, the district court in the case at bar applied an incorrect legal standard- only the foreseeability criteria of the U.S.S.G. §1131.3. Specifically, the district court stated:

> The Court: I think the amount specifically attributable to Mr. Lampkin was under 100, but I do think that there was reason for him to believe that there was additional dealing and that, I mean it's not realistic to think the only person is dealing is me, if I'm dealing with somebody…I think that 100 to 400 is reasonably foreseeable to him.  JA1308-1309

The Court's prior statement proves the Court applied an incorrect legal standard as the correct legal standard is "within the scope of his agreement and reasonably foreseeable.  This Court has held when the conjunction "and" is used both subsections must be met.  (*See Irvin* 2 F.3d 72 (4th Cir. 1993) and U.S.S.G. §1B1.3.

Additionally, the Gilliam Court instructed lower courts to focus on the language of the commentary of U.S.S.G. §1B1.3 that describes conduct that is reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake.  Found under the commentary and application notes of

U.S.S.G. §1B1.3 is a section titled "Illustrations of Conduct for which a Defendant is Accountable," subsection(c) under this title reads: "Requirements that conduct of others be in furtherance of the jointly undertaken criminal activity and reasonably foreseeable, i.e. both prongs of §1B1.3.    Within this subsection are eight illustrations, which provides guidance on conduct that satisfies both prongs of §1b1.3.    Appellant directs this Court's attention to illustration 4, which reads:

> Defendant K is a wholesale distributor of child pornography. Defendant    L is a retail-level dealer who purchases child pornography from Defendant K and resells it but otherwise operates independently of Defendant K.    Similarly, Defendant M is a retail-level dealer who purchases child pornography from Defendant K and resells it, but otherwise operates independently of Defendant K.  Defendant L and M are aware of each other's criminal activity but operate independently.  Defendant N is Defendant K's assistant who recruits customers for Defendant K and frequently supervises the deliveries to Defendant K's customers.  Each defendant is convicted of a count charging conspiracy to distribute child pornography.  Defendant K is accountable under subsection (a)(1)(A) for the entire quantity of child pornography sold to Defendant's L and M.  Defendant N is also accountable for the entire quantity sold to those Defendant's under subsection (a)(1)(B) because the entire quantity was within the scope of his jointly undertaken criminal activity and reasonably foreseeable.  Defendant L is accountable under subsection (a)(1)(A) only for the quantity child pornography he purchased from Defendant K because the scope of his jointly criminal activity is limited to that amount.  For the same reason Defendant M is accountable under subsection (a)(1)(A) only for the quantity of child pornography that he purchased from Defendant K. (See U.S.S.G. §1b1.3.  cmt. N. 2 (c) (4)) The application notes to U.S.S.G. §1b1.3.    place great significance on the independence of the defendant from other conspirators in determining the scope of jointly undertaken criminal activity and reasonable foreseeability. (See U.S.S.G. §1b1.3.  cmt. N. 2 (c) (1-8).).

Again looking at ruling of the *Studley* Court which held a defendant's knowledge of another participants criminal acts is not enough to hold the defendant

66

responsible for those acts." (see *Studley* 47 F.3d 569 (2d Cir. 1995). Both the *Studley* Court and the U.S.S.G. §1B1.3 supports the appellants claim that he cannot be held responsible for the acts of others.

In the wiretapped communications between Gettis and Lampkin there are three separate instances where actual numbers were used, September 29, 2010, October 4, 2010 and October 9, 2010. The Government's expert as; 10 grams, 8-10 grams and 50 grams interpreted these quantities respectively, for a total of 68-70 grams. However, the government's evidence failed to prove any meetings or transactions took place on the dates text messages were sent. Without any meetings or transactions evidence of a conspiratorial agreement is sufficiently missing.

The government's failure to meet prong one of the U.S.S.G. §1b1.3 prevents the district court from applying prong two, reasonably foreseeable.

In examining the record as a whole, the government does not establish any evidence as to what was reasonably foreseeable to this defendant concerning Gettis or his what his allies may have done. The government's evidence shows that the defendant Lampkin communicated exclusively with Gettis. There are no conversations recorded between Lampkin and any other member of the conspiracy. Also, noticeably absent from the Government's evidence was any coordination between Gettis and other members of the conspiracy regarding appellant.

The government argued in their supplemental response that the text message from Felton to Lampkin on January 26, 2011 brings Lampkin into the orbit of the substantially larger quantities that Felton is accused of having dealt. However, this argument fails for two reasons. One, the government never proved that Lampkin responded to or even received this text and two, there is no proof that Lampkin had any interest in consummating a deal with Felton or that any deal occurred as a result of this text. In other words, it was a one-way inquiry from Felton to Lampkin, not an agreement between the parties. It does not therefore impart Lampkin with the scope of knowledge of any other defendant's activities. Furthermore, the summarization of Activation #17776 pg. 11 also showed Mr. Felton and appellant had no relationship as Felton accused the appellant of being a "snitch, rat" however, the government determined that part of the Activation as non-pertinent. JA534-535, 1343.

The following colloquy took place between the Court and Lampkin.

Defendant: It's another issue that's, when applying the mandatory minimum, the government is supposed to directly show how they attribute that amount to me. I don't really recall the case law. Since we're getting into mandatory minimums and they're talking about reasonably attributable, it's a case law in the Fourth Circuit that says they got to show exactly how it's reasonably foreseeable and attributable to me.

The Court: I don't think that's right. If there is, that's an appellate issue. I don't think that's right. I think it has to be reasonably foreseeable to you. And

> I am making a "jump" but the evidence in terms of amount was 70-some. And I understand that. And that's an appellate issue. JA1331.

There was no witness testimony or evidence produced at sentencing to support an increase from the alleged 68-70 grams to over 100. Moreover, the government admitted, "70 grams was the evidence that could be substantiated as to the defendant." It is the evidence, which determines the sentencing range.

The problem is further compounded at sentencing by the Court's "assumption" that if there was evidence of 68-70 grams directly attributable to Lampkin then it was "reasonably foreseeable to Lampkin that Gettis conspiracy was for a quantity greater than 100 grams.

In the *United States v. Hickman,* 626 F.3d 756 (4th Cir.2010) this Court cited two First Circuit cases. In *United States v. Rivera-Maldonado*, 194 F.3d 224, 232 (1st Cir. 1999) held- where drug quantity extrapolations have been upheld the government managed to demonstrate an adequate basis in fact and that the drug quantities were determined in a manner consistent with accepted standards of reasonable reliability. In *United States v. Marreo-Ortiz*, 160 F.3d 768 (1st Cir. 1998) the court held a court cannot uphold a drug quantity calculation on the basis of a hunch or intuition. Another case that is relevant to the issue at bar is *United States v. Archer,* 671 F.3d 149, 165 (2011 2nd Cir.) which held that quantity based enhancements for relevant conduct must be based on specific evidence.

However, the courts assumption was not supported by the government's evidence presented at trial. Without evidence the court's assumption has no basis in the facts presented.

Appellant also disputed the one level enhancement under 21 U.S.C.S. § 860 as the government did not submit to the jury the elements necessary to obtain a guilty verdict under § 860.  In *United States v. Berry* 583 F. Supp. 2d 749 (4th Cir. 2008) the District Court held to obtain a conviction under 21 U.S.C.S. § 860 the government is required to prove the following elements beyond a reasonable doubt: (1) the defendant knowingly possessed the drug in question, (2) that the defendant possessed with intent to distribute substance and (3) that the possession with intent to distribute occurred within 1000 feet of a school.  The government will argue appellant was convicted of an §846 conspiracy, which encompasses §860, however, their argument dictates U.S.S.G. §1B1.3 Relevant Conduct governs the application of §860.  There was no evidence Lampkin agreed, possessed, or had knowledge the Gettis conspiracy was within 1000 feet of a school, nor could it have been reasonable foreseeable.  The government's argument of strict liability at sentencing is not supported by any case law as they offered none.

70

## CONCLUSION

The government's failure in this case is clear as they have failed to prove Lampkin had entered into a conspiratorial agreement or had knowledge of the conspiracies existence.  Noticeably missing from the government's case was one evidenced transaction, any cooperating witness testimony concerning appellant or any corroborating testimony of Special Agent Ryan's interpretations.

With a lack of evidence against Lampkin the government used appellant's prior conviction, which has now been vacated, to portray appellant as a liar and drug dealer in front of the jury and not for the allowed purposes under Fed. R. Evid. 404(B).  Furthermore, Special Agent Ryan, the case agent, was proffered as an expert over the defense's objection.  This agent prepared an error-filled, inaccurate and prejudicial transcript, which the government provided to the jury to assist in listening to wiretapped conversations.  Every interpretation offered by Special Agent Ryan came directly from those transcripts.

Special Agent Ryan acknowledged through his testimony that he lacked the knowledge and experience to interpret appellants' calls; as he never worked in the Baltimore area and therefore was unfamiliar with the drug terminology in Baltimore.  Moreover, Special Agent Ryan did not write down or list any of the alleged code words thereby limiting his ability to compare words in conversations to point to a pattern.  Instead this agent based his interpretations on who was

71

speaking (Gettis) and whether the conversation made sense to him in the context of the case, not the context of the call. More importantly this agent failed to explain how he reached his conclusions concerning appellant's calls as the alleged code words he identified this conspiracy as using were not used in appellant's conversations. With a lack of experience, knowledge and failure to explain how he reached his conclusions this expert testimony failed to satisfy the mandates of Fed. R. Evid. Rule 702 and Fourth Circuit precedent, which requires an expert to adequately, explain how he reached his conclusions and not unbridled speculation.

The government's case against Lampkin was purely circumstantial however none of the circumstantial factors this Court has noted in prior cases can be found in the case against appellant. There were no sales of large amounts of drugs or any sales at all, no sales on consignment or credit, no agreement to look for customers, and no warnings of threats from competitors or law enforcement. The government simply piled inference on top of inference. Furthermore, no alleged conspirator who has entered into a conspiratorial agreement to distribute drugs is going to order drugs on three separate occasions and not once arrange to meet or pick up the drugs. The Jury's verdict was undoubtedly influenced by the large amount of spillover evidence.

The district court abused its discretion in allowing evidence under both Fed. R. Evid. Rule 404(B) and 702 respectively. The district court further abused it's

discretion by allowing the jury to use an error filled prejudicial transcript, denying the appellants buyer/seller instruction and making an unsupported "jump" to increase drug quantity at sentencing not by a preponderance of evidence. The errors by the court were not harmless.

What the government proved in this case is that for a brief period of time between September 20, 2010 and October 9, 2010 Mr. Lampkin and Mr. Gettis, childhood friends, communicated with each other. In *United States v. Bell*, 954 F.2d 232, 237-38 (1993) expressed concern over abuses of the elastic law of conspiracy; and it's significant reluctance to apply conspiracy law to individuals whose most heinous crime is choosing the wrong friends.

For the foregoing reasons, the appellant Wayne Lampkin requests that this Court vacate his conviction and sentence and remand this case to the district court with instructions to enter a Judgment of Acquittal or in the alternative a new trial.

<u>**REQUEST FOR ORAL ARGUMENT**</u>

Wayne Lampkin requests oral argument on the matters presented herein.

Respectfully submitted,
_____/s/_____
**MARC GREGORY HALL**
**Law Office of Marc G. Hall, P.C.**
**200A Monroe Street**
**Suite 310**
**Rockville, Maryland**
**(301) 309-6678**

73

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS TO BE INCLUDED IMMEDIATELY BEFORE THE CERTIFICATE OF SERVICE FOR ALL BRIEFS FILED IN THIS COURT.**

1.      This brief has been prepared using:

Microsoft Word, Fourteen point, Times New Roman

2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules or regulations, and the certificate of service, the brief contains :

17,404 Words

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the work or line printout.

_____/s/_____
Marc Gregory Hall
Counsel for Wayne Lampkin

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the required copies of the Brief of Appellant and Joint Appendix filed with the Clerk, United States Court of Appeals for the Fourth Circuit, this 12th day of November, 2013, via hand delivery and electronically using the Court's CM/ECF system which will send notice of such filing to:

Ayn Brigoli Ducao
OFFICE OF THE UNITED STATES ATTORNEY
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
Ayn.Ducao@usdoj.gov

_____/s/_____
Marc Gregory Hall
Counsel for Wayne Lampkin